COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Petty and Alston
Argued by teleconference


EDWARD JOHNSON
                                                          OPINION BY
v.       Record No. 0439-10-1              JUDGE ROSSIE D. ALSTON, JR.
                                                          MAY 24, 2011
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                         Christopher W. Hutton, Judge

          Terry N. Grinnalds for appellant.

          Benjamin H. Katz, Assistant Attorney General (Kenneth T.
          Cuccinelli, II, Attorney General, on brief), for appellee.


        Edward Johnson (appellant) appeals his convictions under Code §§ 18.2-51 and 18.2-41

for malicious wounding and maiming by mob, respectively.  On appeal, appellant argues that the

evidence was insufficient to support his convictions.  Appellant further contends that his

convictions under both statutes violate principles of double jeopardy.  Finding no error, we

affirm appellant's convictions.

                                   I.  BACKGROUND

        On appeal, we view "the evidence in the light most favorable to the Commonwealth, the

prevailing party in the circuit court, and we accord the Commonwealth the benefit of all

reasonable inferences deducible from the evidence."  Britt v. Commonwealth, 276 Va. 569, 573,

667 S.E.2d 763, 765 (2008).

        So viewed, the evidence indicated that on February 7, 2009, Daniel Ammons (Ammons)

and Cameron James (James), two airmen in the United States Air Force, visited a McDonald's

restaurant in Hampton, Virginia.[1]  While there, they encountered a group of fifteen to twenty men, including appellant, Terry Batten, and a man known only as "Mike-Mike."  After Ammons and James ordered their food, a few men from this group, including Mike-Mike and Batten, saw that Ammons had a red bandana visible in his back pocket and approached the airmen and asked whether they were in a gang.  According to James, he replied that he was not in a gang, and the group of men making the inquiry "acted just like everything was cool."

The airmen then decided to leave the restaurant.  As they collected their order, exited the restaurant, and entered the parking lot, Mike-Mike and Batten followed.  James heard the two men saying, "[N]o, you-all cool, everything's good."  In response, Ammons and James turned around to face the men, one of whom reached out to shake Ammons' hand in what James described as "a gang kind of handshake."  Ammons was unfamiliar with this handshake and did not execute it properly.  At that point most, if not all, of the group of men who had originally confronted Ammons and James in the McDonald's exited the restaurant and approached the two airmen.  James could not recall specifically whether appellant was among the men who exited the McDonald's.  Although James attempted to keep all of the men in his line of sight, he soon felt a blow to the back of his head.  Subsequently, at least four or five members of the group were on top of him, hitting him from every side.  At trial, James testified that he could not identify specifically who hit him.  James further testified that when the beating ended, he was bleeding from his nose and had sustained a broken nose and fractured cheek as a result of this incident.

Thomas Nixon witnessed the attack as he was leaving a restaurant next door to the McDonald's on the evening of February 7, 2009.  As he walked to his nearby car with his wife,

---

[1]Ammons and James wore civilian clothing when they visited the McDonald's.  We refer to them as airmen in this opinion only as a useful label of identification.

he saw "a group of probably fifteen to twenty mix[ed] age males" in the McDonald's parking lot. Next, he realized that someone was being kicked, stomped, and punched and then saw the group converge on top of what looked to be one person. After someone yelled "[C]ops," Nixon saw the group flee from the parking lot. At this point, Nixon rushed over to help the person who had been beaten. When he got to James, Nixon saw "a very large pool of blood beside his head." Nixon also observed blood coming out of James' nose, mouth, and eye. In Nixon's view, there was "a huge amount of blood for a beating," so much so that Nixon initially mistakenly believed that James had been shot.

As a result of the February 7, 2009 incident, appellant was indicted on July 6, 2009, for misdemeanor assault and battery by mob, participation in a criminal street gang, felonious malicious bodily injury, and malicious bodily injury by mob.

Tron Martinez, who was inside the McDonald's when Ammons and James entered, also saw the entire series of events. At trial, Martinez testified that, on February 7, 2009, he and a friend traveled from a party to the Wal-Mart located near the McDonald's on Mercury Boulevard, where they "met up" with approximately seven to eight other men, including Batten, Tevin Terry (Terry), Curtis Scott, and appellant, whom Martinez testified he had not met before that night.

Martinez then decided to go to the McDonald's, where he encountered the same group of men from the Wal-Mart, as well as approximately ten additional men. Martinez observed appellant sitting near the entrance of the restaurant, about thirty feet from Martinez, with Batten, Scott, Terry, and a man Martinez knew as "Ant." Martinez testified that, before the airmen arrived, Terry initiated a confrontation with another patron by intentionally walking into the man. According to Martinez, Terry and appellant then followed the patron outside, and Terry cursed at the man and threw a drink at his car as he drove away.

- 3 -

Shortly thereafter, Martinez saw Ammons and James enter the restaurant. Batten asked Ammons whether the red bandana sticking out of Ammons' back pocket meant he was in a gang. According to Martinez, Ammons responded that he was "trying to get out of a gang." Appellant was sitting about fifteen feet from Batten and Ammons during this exchange. At this point, Martinez heard an unknown speaker exclaim, "Knock him out, like you used to do up state." A few moments later, as Ammons and James attempted to leave the restaurant, Martinez saw Batten attempt to "dap [Ammons] up," or offer him a gang handshake. Ammons failed to properly execute the handshake, after which Batten "waved [Ammons] off." Terry then stated, "I'm gonna [sic] hit the dude, I'm gonna [sic] step on him." At trial, Martinez testified that Terry appeared "[h]ot headed and ready to fight" and that appellant's demeanor and "swagger" indicated that appellant was prepared to aid Terry.

According to Martinez, as Ammons and James exited, "everybody" got up and exited the restaurant. Terry and appellant came up behind Ammons and James. Terry struck Ammons, and appellant struck James. Next, Martinez, Batten, and Scott attacked Ammons. Martinez chased Ammons to another parking lot, and, after striking Ammons one time, Martinez returned to the McDonald's parking lot, where he saw "a whole bunch of people," including appellant, standing around James, who was on the ground. Martinez estimated that only fifteen seconds elapsed between the time that appellant first struck James and the time that Martinez returned to the McDonald's parking lot to find James on the ground, surrounded.

After describing the previously cited circumstances in his trial testimony, Martinez was asked about his criminal record. Martinez admitted having been charged with eleven separate felonies, some from the February 7, 2009 incident and some from a second, later incident. Martinez stated that he was currently out on bail, but not through any agreement with the Commonwealth. He also denied being offered any deals from the Commonwealth in exchange

for his testimony.  On cross-examination, Martinez stated that he had graduated from Hampton High School, where he had played football, and that he hoped to play football in college.  In response to defense counsel's questioning about his hopes for leniency in exchange for his testimony, Martinez responded by recognizing that a felony conviction would adversely affect his college plans; however, he also stated that he appreciated that false testimony would carry negative consequences.  He further stated that he had testified truthfully.

At trial, Detective Earnest Corey Sales of the Hampton Police Division provided expert testimony on gang identification and ideology in the City of Hampton.  Sales testified that "G-checking," or the manner by which gangs identify fellow members, is the process by which a member of a gang asks another individual questions about his gang affiliation in order to "weed out . . . false gang members."  According to Sales, if a person is "flagging," or "wearing a bandana [associated with the gang in his] pocket or on [his] person," it is common practice for a gang member to "G-check" the flagging person in order to test his knowledge of the gang.  If the flagging person is unable to answer the questions posed to him, this can result in a range of repercussions, from stealing this individual's bandana to a potentially fatal "beat down."

At the conclusion of the bench trial, the trial court found appellant guilty of felonious malicious wounding and maiming by mob and acquitted appellant of misdemeanor assault and battery by mob and participation in a criminal street gang.  The trial court found, as a matter of fact, that appellant followed James out of the McDonald's and hit him.  Furthermore, the trial court found that appellant and others from the group

> bec[ame] so incensed that they did, in fact, form a mob mentality
> with a common plan to assault [James] and/or [Ammons].  And
> [they] got up from where they sat and went outside and began to
> accelerate the violence to an extent that resulted in [James']
> wounding in a malicious fashion.

With regard to appellant's conviction for malicious wounding, the trial court found that appellant was "at the very least . . . a principal [in the second degree]." In reaching its findings, the trial court specifically found that Martinez's testimony, while somewhat self-serving, was also accurate and thus credible. In making this credibility determination, the trial court found that Martinez's "demeanor and appearance on the stand, his body language, [and] his response[s] to all the questions he was asked" suggested that he was being truthful.

After his conviction, appellant moved to dismiss one of his two convictions on the grounds that his conviction of both offenses constituted double jeopardy and thus violated his rights under the Fifth Amendment to the United States Constitution and Code § 19.2-294. The trial court rejected appellant's motion to dismiss, essentially reconfirming the determination of guilt, and sentenced appellant to ten years imprisonment for each offense, to run concurrently, with four years of each offense's sentence suspended. This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

#### 1. Standard of Review

In reviewing a conviction for the sufficiency of the evidence, we ask only if "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We "will affirm the judgment unless the judgment is plainly wrong or without evidence to support it." Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008).

## 2. Malicious Wounding

On appeal, appellant first argues that the evidence was insufficient to support his conviction for malicious wounding, because the trial court erred in relying upon Martinez's testimony and because the evidence did not show that appellant's actions caused James' injuries.[2] We reject both of appellant's arguments and hold that the evidence was sufficient to support appellant's conviction for malicious wounding.

Appellant contends that the trial court erred in relying upon Martinez's testimony because it was inherently suspect. In support of this claim, appellant maintains that Martinez admitted to striking one of the two airmen at least once during the incident. In addition, Martinez had charges pending based on the underlying incident and a second, unrelated incident, and he faced

---

[2] Rule 5A:18, as in effect at the time of appellant's trial, provided that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling . . . ." We note that at trial, appellant did not state his objection to the sufficiency of the evidence regarding causation with the precision or particularity that is generally desirable. However, for purposes of this matter we find that appellant stated his concern with the minimum amount of specificity necessary to fulfill the requirements of Rule 5A:18. In his closing argument, appellant stated,

> In any event, between these two charges [of malicious wounding and malicious wounding by mob], I would assume the Court would have to make a determination *whether my client caused*, uh, if the Court did feel that there was a maiming, the Court would make a determination whether it was with a mob or without a mob . . . .

(Emphasis added).

Because appellant referenced the issue of causation, we find that he met the minimum requirements of Rule 5A:18. The purpose of Rule 5A:18 is to "enable the ruling court to take any necessary corrective action," Saunders v. Commonwealth, 38 Va. App. 192, 195, 562 S.E.2d 367, 369 (2002), and to "rule intelligently on the issues presented," Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991). Appellant's statement regarding causation in his closing argument fulfilled this purpose; indeed, the trial court made an explicit finding of fact regarding causation, stating that the members of the group who followed the airmen outside the McDonald's "accelerated the violence to an extent *that resulted* in Mr. James' wounding in a malicious fashion." (Emphasis added). As a result, we conclude that the primary purpose of Rule 5A:18 was accomplished and thus appellant's argument regarding causation is not waived on appeal.

criminal penalties and damage to his prospective college football career if convicted. The possibility of Martinez's bias was raised during both direct- and cross-examination at trial. Martinez also stated that he testified honestly in the instant case and was not offered anything in exchange for his testimony.

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). The conclusions of the fact finder on issues of witness credibility "may only be disturbed on appeal if this Court finds that [the witness'] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" Robertson v. Commonwealth, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991) (quoting Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984)). The trial court specifically found that Martinez was credible, stating,

> Mr. Martinez is a co-defendant in matters, apparently in this case and some partially related case. I found his demeanor and appearance on the stand, his body language, his response to all the questions he was asked to be one of a truthful person. While his testimony was in some degree self serving, I believe it was also accurate.

Because Martinez's credibility is solely a matter for the trial court as the finder of fact, we will not disturb this determination on appeal. His testimony was not inherently incredible or so contrary to human experience as to render it unworthy of belief. Therefore, we find no error in the trial court's reliance upon Martinez's testimony regarding the incident.

Appellant further asserts that the evidence was insufficient to support his conviction because it failed to show that appellant's actions caused James' injuries. Appellant presents two arguments in support of this contention: he argues that the evidence was insufficient to show that James was wounded; in the alternative, appellant argues that the evidence was insufficient to show that appellant's actions caused James' wounds.

Code § 18.2-51 provides, in pertinent part, "If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony." Thus, "[t]o support a conviction for malicious wounding under Code § 18.2-51, the Commonwealth must prove that the defendant inflicted the victim's injuries 'maliciously and with the intent to maim, disfigure, disable or kill.'" Robertson v. Commonwealth, 31 Va. App. 814, 823, 525 S.E.2d 640, 645 (2000) (quoting Campbell v. Commonwealth, 12 Va. App. 476, 483, 405 S.E.2d 1, 4 (1991) (*en banc*)).

First, appellant asserts that because no medical evidence regarding James' injuries was introduced, the evidence was insufficient to show that James was wounded at all as a result of the attack.[3] We find no Virginia authority that requires the testimony of a medical professional or similar expert evidence to show that a victim was wounded, and we decline to adopt such a requirement in this case.

Furthermore, based on James' and Nixon's testimony regarding James' injuries, we hold that the evidence was sufficient to establish that James was wounded in a manner sufficient to satisfy the requirements of Code § 18.2-51. The Supreme Court of Virginia, in interpreting the predecessor statute to Code § 18.2-51, previously held that to prove the existence of a "wound," the Commonwealth must show that the victim's skin was broken or cut. Johnson v. Commonwealth, 184 Va. 409, 413, 35 S.E.2d 594, 595 (1945) (affirming the continuing validity of Harris v. Commonwealth, 150 Va. 580, 142 S.E. 354 (1928)). Similarly, in Harris, the Court held that a "wound" is defined as "a breach of the skin, or of the skin and flesh, produced by

---

[3] Appellant does not contend that the evidence was insufficient to show his intent to maim, disfigure, disable, or kill. Therefore, we do not address this issue on appeal. Rule 5A:20(c); see also Winston v. Commonwealth, 51 Va. App. 74, 82, 654 S.E.2d 340, 345 (2007) (holding that because an appellant did not include an argument in his questions presented (now assignments of error), the Court would not address it on appeal); Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992) ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration.").

external violence." 150 Va. at 584, 142 S.E. at 355 (internal quotation omitted). The Court stated that "[w]ithout such a parting of the skin . . . there can be no wounding . . . . Yet a disruption of the internal skin – as, that within the mouth . . . will suffice." Id.

Here, James testified that after the attack he believed his nose was broken "because [he] was bleeding." The trial court could reasonably interpret this statement to mean that James was bleeding from the nose. In addition, Nixon testified that he found James with "a very large pool of blood beside his head," with blood "coming out his nose, his mouth, [and] his eye." This testimony supports the finding that James was bleeding from the nose, mouth, and eye; as a result, the trial court could reasonably infer that James' skin in or around his nose, mouth, and eye had been broken or cut. Under Johnson and Harris, these breaks or cuts in the skin are sufficient to show that James suffered a wound, and we hold that the evidence in the instant case was sufficient to find that James suffered a qualified "wound" under the applicable statutory provision.

Appellant next argues that even if James was wounded in the attack, the evidence was insufficient to show that appellant's actions caused James' wounds. Appellant alleges that the evidence established that he struck James only once, at most, and that a single blow could not have caused the wounds James suffered. Assuming without deciding that the evidence established that appellant struck James only once, we nevertheless find that the evidence was sufficient to prove that appellant, at a minimum, acted as a principal in the second degree in the malicious wounding of James. Appellant misapprehends the nature of the evidence necessary to support his culpability as a principal in the second degree. "'It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime.'" Thomas v. Commonwealth, 279 Va. 131, 156, 688 S.E.2d

220, 234 (2010) (quoting McMorris v. Commonwealth, 276 Va. 500, 505, 666 S.E.2d 348, 351 (2008)).

Malicious wounding is a Class 3 felony. Code § 18.2-51. A principal in the second degree to a malicious wounding is punishable in all respects as a principal in the first degree. Washington v. Commonwealth, 43 Va. App. 291, 306, 597 S.E.2d 256, 263 (2004) ("'Generally, in the case of every felony, a principal in the second degree may be indicted, tried, convicted, and punished in all respects as if a principal in the first degree.'" (quoting Taylor v. Commonwealth, 260 Va. 683, 687-88, 537 S.E.2d 592, 594 (2000))); see also Code § 18.2-18. In Virginia,

> "[a] principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." Brown v. Commonwealth, 130 Va. 733, 736, 107 S.E. 809, 810 (1921). As for what constitutes "aiding and abetting," it is clear that mere presence and consent will not suffice. E.g., Underwood v. Commonwealth, 218 Va. 1045, 1048, 243 S.E.2d 231, 233 (1978). The defendant's conduct must consist of "inciting, encouraging, advising or assisting in the [crime]." Frye v. Commonwealth, 231 Va. 370, 389, 345 S.E.2d 267, 280 (1986). It must be shown that the defendant procured, encouraged, countenanced, or approved commission of the crime. Augustine v. Commonwealth, 226 Va. 120, 124, 306 S.E.2d 886, 888-89 (1983).

Rollston v. Commonwealth, 11 Va. App. 535, 539, 399 S.E.2d 823, 825 (1991). Moreover, "'[w]hen the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator.'" Id. at 539, 399 S.E.2d at 825-26 (quoting R. Groot, Criminal Offenses and Defenses in Virginia 183 (1984)).

Here, the trial court found that appellant hit James as part of the group-beating or immediately before the group-beating began. This finding was supported by Martinez's

testimony that appellant struck James as Terry simultaneously struck Ammons.  Furthermore,

Martinez testified that, a short time later, he saw appellant standing with a group of men around

James.  Nixon testified that, during the same time period, he saw a group of men standing around

James kicking, stomping, and punching him.  This evidence was sufficient to support the trial

court's finding that appellant was present during the malicious wounding of James and

performed an overt act of assistance or encouragement by striking the initial blow against James.

Therefore, the evidence was sufficient to sustain appellant's conviction for malicious wounding

as a principal in the second degree in violation of Code § 18.2-51.

### 3.  Maiming by Mob

Appellant also argues on appeal that the evidence was insufficient to support his

conviction for maiming by mob in violation of Code § 18.2-41 because the evidence was

insufficient to prove that the men had assembled to achieve a common purpose or action.

Code § 18.2-38 defines a "mob" as "[a]ny collection of people, assembled for the purpose

and with the intention of committing an assault or a battery upon any person or an act of violence

as defined in [Code] § 19.2-297.1, without authority of law . . . ."  We reject appellant's initial

argument that, because the men had already assembled at the McDonald's before the airmen

arrived, they could not have "assembled for the purpose and with the intention" of committing an

act of violence.  While "[t]he criterion which distinguishes individual behavior while part of a

group from 'mob' behavior is assembling for the specific purpose and with the specific intent" of

committing an act of violence,

> [t]hat is not to say that the purpose for which the group initially
> came together must have been for the purpose of committing [an
> act of violence] before a "mob" may be said to have "assembled."
> It is possible that individuals who are lawfully assembled may
> become members of a "mob" without great deliberation and for
> them to become part of a group which is moved or controlled by
> those impulsive and irrational forces which perpetuate mob
> violence. . . .

Harrell v. Commonwealth, 11 Va. App. 1, 7, 396 S.E.2d 680, 683 (1990). Thus, the fact that the men may have originally assembled at the McDonald's for a lawful purpose before the airmen arrived does not preclude the possibility that the group later developed into a mob. The impulsive and irrational forces that may exist to transform peaceable assembly into mob violence are to be evaluated on a case-by-case basis. See id. at 7-8, 396 S.E.2d at 683 (stating that "[w]hether a group of individuals has been so transformed into a 'mob' depends upon the circumstances . . .").

To prove that the group in the instant case assembled into a mob, the Commonwealth must show that the group formed a collective purpose and intent to commit an act of violence. Id.

> Whether a group of individuals has been so transformed into a "mob" depends upon the circumstances; no particular words or express agreements are required to effect a change in a group's purpose or intentions. Events or emotionally charged circumstances suddenly may focus individuals toward a common goal or purpose without an express or stated call to join forces.

Id. This Court may consider "the purpose, circumstances, or the setting of the group's initial assemblage" and also "proof of what transpired after the original assemblage" to determine whether a group assembled into a mob. Id. at 10, 396 S.E.2d at 684-85.

Abdullah v. Commonwealth, 53 Va. App. 750, 675 S.E.2d 215 (2009), is instructive in the instant case. In Abdullah, this Court found the existence of a mob where a group of approximately twelve men followed the victim's movements so as to intercept him, surrounded the victim as he emerged from an alley, and then assaulted and battered the victim. 53 Va. App. at 758, 675 S.E.2d at 219. Similarly, in the instant case, the group of men emerged from the McDonald's *en masse*, followed James and Ammons, surrounded James and Ammons, and then beat James and struck and chased Ammons.

- 13 -

Furthermore, the actions of the group, including those of appellant, suggested that the group acted in concert to attack James and Ammons. While some members approached the airmen, appellant, Terry, Martinez, and others sneaked behind James and Ammons and attacked them. This coordinated action is sufficient to establish beyond a reasonable doubt that the members of the group, including appellant, were acting collectively with the intent to commit an act of violence. See Hughes v. Commonwealth, 43 Va. App. 391, 402, 598 S.E.2d 743, 748 (2004) (holding that the evidence was sufficient to sustain the convictions of three brothers for malicious wounding by mob in violation of Code § 18.2-41 where the brothers acted in concert to attack, assault, and batter three men, as "[t]heir actions in attacking various individuals clearly indicate[d] that they were acting collectively with the intent to assault").

Finally, although no express or stated call to join forces is necessary to constitute an assembly into a mob, Harrell, 11 Va. App. at 7-8, 396 S.E.2d at 683, in the instant case, Martinez testified that Terry stated, "I'm gonna [sic] hit the dude, I'm gonna [sic] step on him" immediately before he exited the McDonald's and other members of the group followed. The trial court could reasonably infer that the group shared Terry's intent to commit an act of violence against the airmen and assembled for that purpose, especially in light of the fact that members of the group then attacked the airmen.

Because the evidence, when viewed in the light most favorable to the Commonwealth, showed that the group, including appellant, acted in concert to attack James and Ammons following Terry's stated intent to hit at least one of the airmen, the evidence was sufficient to show that a mob had assembled with the purpose and intent of committing an act of violence. Therefore, we hold that the evidence was sufficient to sustain appellant's conviction under Code § 18.2-41.

## B. DOUBLE JEOPARDY

Appellant also contends that his convictions under both Code §§ 18.2-51 and 18.2-41 violate double jeopardy principles, as he has been twice punished for the same offense. For the reasons that follow, we hold that appellant's convictions for malicious wounding under Code § 18.2-51 and maiming by mob under Code § 18.2-41 do not violate the prohibition on double jeopardy.

"In reviewing a double jeopardy claim, or a claim based on statutory interpretation, this Court shall conduct a *de novo* review." Davis v. Commonwealth, 57 Va. App. 446, 455, 703 S.E.2d 259, 263 (2011).

The Fifth Amendment to the United States Constitution "guarantees protection against . . . multiple punishments for the same offense." Payne v. Commonwealth, 257 Va. 216, 227, 509 S.E.2d 293, 300 (1999). "To determine whether two charges constitute the same offense, we must consider the rule enunciated in Blockburger [v. United States, 284 U.S. 299 (1932)]." Davis, 57 Va. App. at 455, 703 S.E.2d at 263.

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. Gavieres v. United States, 220 U.S. 338, 342 (1911), and authorities cited. . . . "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

Blockburger, 284 U.S. at 304 (quoting Morey v. Commonwealth, 108 Mass. 433 (1871)). The Blockburger test "'emphasizes the elements of the two crimes. If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" Commonwealth v. Hudgins, 269 Va. 602, 605, 611 S.E.2d 362, 364 (2005) (quoting Brown v. Ohio, 432 U.S. 161, 166 (1977)). Moreover, "[i]n

- 15 -

applying the Blockburger test, we look at the offenses charged *in the abstract*, without referring to the particular facts of the case under review." Coleman v. Commonwealth, 261 Va. 196, 200, 539 S.E.2d 732, 734 (2001) (emphasis added). This standard requires that we view the elements of the offenses generally and conceptually, rather than the elements of the offenses as charged in a specific instance. Thus, "[a] double jeopardy violation exists only if the offenses *always* require proof of the same elements." Davis, 57 Va. App. at 456, 703 S.E.2d at 263 (emphasis added).

We note at the outset that appellant concedes that Code § 18.2-41, prohibiting maiming by mob, contains an additional element not found in Code § 18.2-51, namely, the existence of a mob. However, appellant argues that Code § 18.2-51 contains no elements not found in Code § 18.2-41. Thus, the only question before this Court is whether Code § 18.2-51 contains an element not found in Code § 18.2-41, when both statutes are viewed in the abstract.

In Paiz v. Commonwealth, 54 Va. App. 688, 698, 682 S.E.2d 71, 76 (2009), this Court stated,

> [W]e note that malicious wounding by mob, as set out in Code § 18.2-41, is a different offense from malicious wounding as codified in Code § 18.2-51. Malicious wounding by mob does not require the Commonwealth to prove malice because it defines the crime as "maliciously or unlawfully [wounding] any person . . . with intent to maim, disable, disfigure, or kill him . . . ." Code § 18.2-41. The disjunctive term "or," which separates the terms "maliciously" and "unlawfully," indicates that Code § 18.2-41 only requires proof that the wounding was unlawful. Code § 18.2-41 therefore criminalizes different conduct from malicious wounding under Code § 18.2-51.

We find this reasoning persuasive in the instant case. Code § 18.2-51 codifies two distinct crimes: malicious wounding and unlawful wounding. Code § 18.2-51 provides,

> If any person *maliciously* shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a *Class 3 felony*.

- 16 -

> If such act be done *unlawfully but not maliciously*, with the intent aforesaid, the offender shall be guilty of a *Class 6 felony*.

(Emphasis added). In contrast, Code § 18.2-41 codifies only one crime, providing,

> Any and every person composing a mob which shall *maliciously or unlawfully* shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disable, disfigure or kill him, shall be guilty of a Class 3 felony.

(Emphasis added). Appellant argues that, contrary to the holding in Paiz, Code § 18.2-51 and Code § 18.2-41 are not distinct because, while Code § 18.2-41 criminalizes maliciously *or* unlawfully wounding another person, so too does Code § 18.2-51, albeit as different classes of felonies. In other words, appellant argues that if one is guilty of maiming by mob under Code § 18.2-41, one is also necessarily guilty of a violation of Code § 18.2-51, be it either malicious wounding or unlawful wounding. This argument, however, ignores the fact that Code § 18.2-51, when viewed in the abstract, creates two distinct crimes with distinct elements, malicious wounding and unlawful wounding, because it imposes different punishments based on the defendant's intent. As a result, malicious wounding and unlawful wounding, while both codified in Code § 18.2-51, should rightly be considered separate offenses for the purposes of the Blockburger test.

The holding of Hudgins, 269 Va. 602, 611 S.E.2d 362, supports this construction. In Hudgins, the defendant was acquitted of robbery in violation of Code § 18.2-58. 269 Va. at 604, 611 S.E.2d at 364. Ten days later, the defendant was indicted for grand larceny from the person in violation of Code § 18.2-95 based on the same underlying conduct. Id. The defendant appealed his conviction, alleging that grand larceny from the person is a lesser-included offense of robbery and therefore his conviction was barred by his earlier acquittal of robbery. Id. The Supreme Court of Virginia held that, under the Blockburger test, robbery and grand larceny from the person were not the same offense because each contained an element not found in the other.

Id. at 606, 611 S.E.2d at 365. The Court held that robbery was distinct from grand larceny from the person because under the common law definition of robbery, there must be a taking *by violence or intimidation*, unlike larceny. Id. Furthermore, the Court held that grand larceny from the person was distinct from robbery because, under Code § 18.2-95, grand larceny from the person required the taking of a thing *with a value of $5 or more*, unlike robbery. Id.

In so holding, the Supreme Court of Virginia overruled a decision of this Court that the two offenses contained the same elements. Id. This Court, reasoning that "the reference in Code § 18.2-95 [the grand larceny statute] to the value of the property stolen relate[d] solely to 'the degree of the potential punishment' for the offense of grand larceny from the person," had found as a result, "that value is not an element of the offense." Id. In holding that this was error, the Supreme Court of Virginia stated,

> In Apprendi v. New Jersey, [530 U.S. 466, 478 (2000),] the Supreme Court noted that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court . . . as it existed during the years surrounding our Nation's founding."
>
> \* \* \* \* \* \* \*
>
> "Put simply," the Court said, "if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact – no matter how the State labels it – constitutes an element, and must be found by a jury beyond a reasonable doubt." Sattazahn [v. Pennsylvania], 537 U.S. [101, 111 (2003)].

Id. at 606-07, 611 S.E.2d at 365.

Similarly, in the instant case, malicious wounding as codified by Code § 18.2-51 contains an element that leads to a more severe punishment than that for unlawful wounding, also codified by Code § 18.2-51. Malicious wounding requires proof of malice and is punishable as a Class 3 felony. Code § 18.2-51. In contrast, unlawful wounding requires no showing of malice and is

- 18 -

punishable as a Class 6 felony. Id. Because different elements must be proven and different penalties are imposed for each offense, malicious wounding and unlawful wounding must be treated as distinct offenses codified together in the same statute. Thus, because under Code § 18.2-51 the existence of malice is an aggravating factor that increases the penalty for the crime from a Class 6 to a Class 3 felony, Hudgins requires that this Court consider malicious wounding as a distinct crime with distinct elements when applying the Blockburger test. Hudgins, 269 Va. at 606-07, 611 S.E.2d at 365. In contrast, maiming by mob requires a showing of malice *or* unlawful conduct; regardless of the defendant's intent, both are punishable as a Class 3 felony. Code § 18.2-41. Consequently, Code § 18.2-41 codifies only one crime, maiming by mob, whether it be done with malice or merely unlawfully.

As a result, the question in this case is not whether Code § 18.2-41, maiming by mob, and Code § 18.2-51, including both malicious wounding and unlawful wounding, contain distinct elements when viewed in the abstract. Rather, the question is whether maiming by mob, as codified by Code § 18.2-41, and *malicious wounding*, as codified by Code § 18.2-51, contain distinct elements when viewed in the abstract. As in Paiz, 54 Va. App. at 698, 682 S.E.2d at 76, we hold that malicious wounding contains an additional element not found in maiming by mob.[4] Under Code § 18.2-51, the Commonwealth must prove malice to sustain a conviction for malicious wounding. Under Code § 18.2-41, the Commonwealth need not prove malice to sustain a conviction for maiming by mob; by its plain language, Code § 18.2-41 criminalizes acts that are malicious *or* unlawful.[5] From this analytical perspective, it follows that one who is

---

[4] However, we do not address in this opinion whether *unlawful* wounding under Code § 18.2-51 contains additional elements not found in maiming by mob under Code § 18.2-41.

[5] We reject appellant's argument that his convictions in the instant case nevertheless constituted double jeopardy because he was charged with malicious wounding and *malicious* wounding by mob. Under Coleman, this Court must "look at the offenses charged in the abstract, without referring to the particular facts of the case under review." 261 Va. at 200, 539

guilty of maiming by mob is not necessarily guilty of malicious wounding; an unlawful wounding while part of a mob would not satisfy the requirements of malicious wounding under Code § 18.2-51, as no malice exists. Accordingly, we hold that appellant's convictions for malicious wounding under Code § 18.2-51 and maiming by mob under Code § 18.2-41 do not violate principles of double jeopardy.

## III.  CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed</u>.

---

S.E.2d at 734.  In the abstract, the offense charged, maiming by mob under Code § 18.2-41, prohibits "maliciously or unlawfully" wounding another person.