# COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Beales, Callins and Senior Judge Clements
Argued at Richmond, Virginia


JOSE SAUL GRIMALDO

v.      Record No. 0449-23-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE DOMINIQUE A. CALLINS
OCTOBER 8, 2024


### FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Bradley B. Cavedo, Judge

Jesse Baez (T. Noel Brooks; Brooks & Baez, on brief), for appellant.

Jason D. Reed, Assistant Attorney General (Jason S. Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Jose Saul Grimaldo of rape. On appeal, Grimaldo argues that the trial court erred by denying his motions to strike and to set aside the jury's verdict. He also contends that the trial court erred by denying his motion to strike two jurors for cause. Because we find that the trial court erred in denying his motion to strike one of the jurors for cause, we reverse Grimaldo's conviction and remand for a new trial.

BACKGROUND[1]

I.  Voir Dire

During voir dire, the prosecution informed the venire panel that, if seated, they would have to swear to follow the law.  The prosecution then asked the venire if there was "anyone who's going to have a problem with following the law that [the trial judge] tells you?"  None of the members of the venire responded that they would have difficulty applying the law or jury instructions to the evidence presented at trial.  Later, Juror 36 offered that she worked with mental health patients and counseled victims of sexual abuse.  She indicated that she worked with individuals on "both sides of abuse and neglect."  Juror 36 confirmed that she nevertheless could follow the trial court's instructions and "would be able to not bring extraneous information into the jury room."  She emphasized that having worked with both perpetrators and victims, she could objectively review the evidence and decide the case "without any kind of preconceived notions."  Additionally, Juror 36 indicated that she may have had some familiarity with one of the prosecutors "[m]aybe years ago." The trial court denied Grimaldo's motion to strike Juror 36 for cause, finding that the potential juror stated "[o]ver and over" that she could be fair.

Grimaldo's attorney prefaced his final voir dire question by offering that, if a juror felt uncomfortable talking about the experience, "we can go in the back[2] and talk."  Counsel then asked the venire, "Is there anyone who knows someone who has been the victim of a sexual assault?"

---

[1] "[W]e review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).  "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'"  *Id.* at 97 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018) (per curiam)).

[2] According to the record, "in the back" appears to refer to a place or space in the courtroom beyond the hearing of the venire.

Juror 17 and Juror 14, among others, answered the question affirmatively. Juror 17 indicated that she had experienced sexual abuse. When asked if she could objectively weigh the evidence and make an impartial decision, Juror 17 responded that "I would want to believe that I could." Grimaldo's attorney then further inquired: "I mean, do you—you're saying you want to believe. Do you think you can?" Juror 17 answered that "[i]t's hard to know without hearing the evidence because obviously I don't know what kind of emotional reaction I will have. Yes, I would try. I would be—I know it might be difficult, but that's my goal." Grimaldo did not move to strike Juror 17, and she was ultimately seated on the jury panel.

Similarly, Juror 14 stated that she had been a victim of sexual assault. The following exchange ensued between Grimaldo's attorney and Juror 14:

> [Counsel]: I mean, I knew this was a hard question to ask, but we really can't thank all of you enough for being honest. Do you feel like that experience will influence your decision-making today?
>
> [Juror 14]: (Nodded her head up and down).
>
> [Counsel]: You do?
>
> [Juror 14]: I mean, I would hope not, but, I don't know. It's hard. I would rather go in the back.
>
> [Counsel]: All right. I'm very sorry.
>
> [Juror 14]: Okay.

Neither the trial court nor the attorneys asked Juror 14 any further questions. The attorneys also did not take Juror 14 "in the back" to further discuss her experience. As Grimaldo's attorney moved to strike Juror 14 for cause, she noted that the potential juror was crying. Although the trial court acknowledged that Juror 14 was "upset," it determined that "given her situation, she did very well with the level of commitment to try to do the right thing." Noting that "I think a lot of people were in tears," the trial court denied Grimaldo's motion to strike Juror 14 for cause. Grimaldo used his peremptory strikes to remove Juror 36 and Juror 14 from the venire.

## II. Evidence at Trial

In March 2022, M.Q.,[3] who had previously been in a long-term romantic relationship with Grimaldo, discovered that Grimaldo had embezzled money from M.Q.'s "construction cleaning" business. In the course of finalizing an audit of the insurance on her business, M.Q. went to Grimaldo's residence, which M.Q. owned, to retrieve a checkbook. While there, M.Q. and Grimaldo began arguing: M.Q. discovered approximately $93,000 missing from her business account and accused Grimaldo of "giving out checks to his lover." The argument—which ranged from the topic of the missing money to Grimaldo's affair to his treatment of M.Q. and her daughters—got "heavy" before escalating into a physical altercation. M.Q. slapped Grimaldo and threatened to "call the police and file a report for embezzlement." Grimaldo yelled at M.Q. and pushed her down the hallway towards the bedroom. Afraid for her safety, M.Q. "tried to make noise," screamed, and broke a window, in an attempt to gain the attention of some employees "in the back of the house." When that effort failed, she threw a bottle of perfume at Grimaldo.

After another 30 minutes of arguing, M.Q. persuaded Grimaldo to leave her alone in the bathroom, and she ultimately escaped from the residence through the bathroom window. M.Q. then called Grimaldo's lover and "explained to her what's going on," before going to meet with her accountant. At this meeting, M.Q. learned that her company owed two years of federal taxes and that half of her company's earnings "was not reflected in [her] bank."

After the meeting with her accountant, M.Q. returned to her separate residence and spoke with Grimaldo "several times." According to M.Q., Grimaldo "apologized for the deception" and told her "that [they] would work together to pay back the money [M.Q.] owed to the federal government." The two ultimately agreed to meet later so that M.Q. could pick up her company

---

[3] We use initials, instead of the assault victim's name, to protect the privacy of the victim. *See Poole v. Commonwealth*, 73 Va. App. 357, 360 n.1 (2021).

checkbooks, bank cards, work equipment, and titles for the vehicles. After having dinner together at a food truck, M.Q. and Grimaldo returned to Grimaldo's residence. Although the conversation began "calm," Grimaldo refused to return M.Q.'s business items, telling M.Q. that "he was still the man in the house" and that they "were still together." Once again, M.Q. threatened to call the police to report the embezzlement. As they continued to argue, M.Q. demanded that Grimaldo "grab his stuff and go" with his lover and that he leave the residence that she owned.

Once again, their argument escalated. Grimaldo "started pulling [M.Q.'s] arm and saying that [she] needed to calm down" so that they could talk. According to M.Q., she said "very bad" things that insulted Grimaldo's mother, and then he "got very violent." Grimaldo took M.Q. by the arms and shook her, saying that "if there was a whore in that place, it was" M.Q. When M.Q. retorted that she "was going to be a whore to anybody but him," Grimaldo told M.Q. he would "teach [her] how whores are treated" and began pushing her into the bedroom. M.Q. protested, but Grimaldo ultimately pushed her and "pinned" her face down on the bed. Grimaldo ripped M.Q.'s clothing and pulled her pants down. M.Q. testified that Grimaldo raped her, forcing his penis into her vagina as M.Q. asked him to "please stop." Grimaldo covered M.Q.'s mouth as she tried to scream; she bit his finger, leaving a mark. M.Q. also scratched Grimaldo's face, breaking her acrylic nail and causing her finger to bleed. When arrested, Grimaldo bore a scratch on the right side of his face and a mark on his finger.

Following the assault, M.Q. was unable to leave immediately because Grimaldo had her keys. Grimaldo stated that the assault "was not a serious thing," and tried to calm her down. When she was finally able to leave, M.Q. went home and washed herself. M.Q. called a friend, who came over and urged M.Q. to call the police.

Later, M.Q. called Grimaldo to tell him "how [she] was feeling." According to M.Q., Grimaldo responded that M.Q. had "been through worse" and that "[t]his is nothing." He told M.Q.

that she was "going to be depressed" and "going to cry for two days and then" she would "go out and get drunk with [her] friends" and "move on with [her] life like nothing happened." M.Q. testified that she developed bruising on her body in the days following the incident.

Forensic Nurse Examiner Jean Cheek examined M.Q. at the hospital the day after the incident and collected swabs for DNA analysis. She reported observing injuries on the right side of M.Q.'s body. On cross-examination, Nurse Cheek acknowledged that the photographs the Commonwealth introduced showing bruising on the left side of M.Q.'s body were inconsistent with the injuries she observed during her physical examination of M.Q.

Richmond Police Detective Cho spoke with Grimaldo and collected a buccal swab for DNA analysis. Grimaldo told Detective Cho that M.Q. had assaulted him and had consented to the sexual intercourse. He admitted that M.Q. caused the mark on his finger and the scratch on his face, and testing confirmed that the evidence collected from M.Q. matched Grimaldo's DNA. M.Q. later provided her torn clothing to Detective Cho.

Testifying on Grimaldo's behalf, "Claudia," his "lover," acknowledged that she and Grimaldo were romantically involved and had a child together. Claudia testified that on the day of the incident, M.Q. "had found out everything what was going on" and called Claudia. Claudia testified that M.Q. called her a "f***ing whore" and called her child "a bastard." In rebuttal, M.Q. acknowledged that she had "rage inside of [her]" upon learning of Grimaldo's relationship with Claudia, but she denied fabricating a rape allegation.

III. Grimaldo's Motions

Following the Commonwealth's case, Grimaldo moved to strike the evidence, arguing that M.Q. sought revenge for Grimaldo's affair with Claudia and for embezzling from her business. Grimaldo argued that M.Q.'s testimony was inherently incredible. The trial court denied the motion, and Grimaldo renewed it at the close of all the evidence. In addition to his prior arguments,

Grimaldo emphasized the discrepancies between M.Q.'s photographs of her injuries and Cheek's documentation of the injuries she observed during the forensic examination. The trial court denied Grimaldo's motion. The jury found him guilty of rape. The trial court subsequently denied Grimaldo's motion to set aside the jury's verdict, in which Grimaldo again argued that M.Q.'s testimony was inherently incredible. Grimaldo appeals.

ANALYSIS

I. Striking Jurors for Cause

Grimaldo argues that the trial court erred in denying his motion to strike Jurors 36 and 14 for cause.

"The striking of any individual potential juror for cause . . . is committed to the sound discretion of the trial court." *Warren v. Commonwealth*, 76 Va. App. 788, 799 (2023) (quoting *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005)). A reviewing court must defer to a trial court's ruling, and the decision to retain or exclude a prospective juror for cause "will not be disturbed on appeal unless there has been a manifest error amounting to an abuse of discretion." *Huguely v. Commonwealth*, 63 Va. App. 92, 121 (2014) (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61-62 (2011)). This is "because the trial [court] has the opportunity . . . to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand." *Juniper v. Commonwealth*, 271 Va. 362, 400 (2006).

Although this Court recognizes the discretion afforded trial courts in evaluating these motions, that discretion is not to the extent of overriding an accused's constitutional right to an impartial trial. *See Williams v. Commonwealth*, 14 Va. App. 208, 212 (1992) ("The right of an accused to a trial by 'an impartial jury' is a constitutional right."). Indeed, both the United States and Virginia Constitutions preserve the right of the accused to be tried by an impartial jury. U.S

Const. amend. VI; Va. Const. art. I, § 8; Code § 8.01-358 (requiring that venirepersons must stand indifferent to the cause).

"In Virginia, a defendant in a criminal case 'is entitled to a panel of jurors free from exceptions *before* exercising peremptory challenges.'" *DeLeon v. Commonwealth*, 38 Va. App. 409, 412 (2002) (emphasis added) (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 755 (2000)). "Any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." *Id.* (quoting *Breeden v. Commonwealth*, 217 Va. 297, 298 (1976)); *see also Williams*, 14 Va. App. at 213 ("[W]here there is a reasonable doubt whether a juror is qualified, that doubt must be resolved in favor of the accused."). "In determining whether a juror is free from prejudice, nothing should be left to inference or doubt." *Williams*, 14 Va. App. at 213 (citing *Dejarnette v. Commonwealth*, 75 Va. 867, 871 (1881)). Our Supreme Court has declared that if there is *any* reasonable doubt about a juror's ability to be impartial, then that juror should be excluded:

> All the tests applied by the courts, all the enquiries made into the state of the juror's mind, are merely to ascertain whether he comes to the trial free from partiality and prejudice.
>
> If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion. For, as has been well said, it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible.

*Justus v. Commonwealth*, 220 Va. 971, 976 (1980) (quoting *Wright v. Commonwealth*, 73 Va. (32 Gratt.) 941, 943 (1879)).

"It is a trial court's responsibility to ensure that jurors are free from bias." *Goodwin v. Commonwealth*, 71 Va. App. 125, 135 (2019); *see also Slade v. Commonwealth*, 155 Va. 1099, 1106 (1931) ("It is the duty of the trial court through the legal machinery provided for that purpose to procure an impartial jury to try every case."); Code § 8.01-358 ("[I]f it shall appear to

*the court* that the juror does not stand indifferent in the cause, another shall be drawn or called." (emphasis added)). To test impartiality, the trial court must determine "whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial." *Cressell*, 32 Va. App. at 761. "In conducting our review, we consider the juror's entire *voir dire*, not merely isolated statements." *DeLeon*, 38 Va. App. at 413 (quoting *Lovitt v. Commonwealth*, 260 Va. 497, 510 (2000)); *see also Goodwin*, 71 Va. App. at 136 (providing that the trial court evaluates jury impartiality "as a whole, not just isolated statements by that juror").

Grimaldo argues that Juror 14 should have been struck for cause because, during voir dire, Juror 14 "did not indicate [that] she could decide the case impartially." Because there was reasonable doubt about her ability to remain impartial as a victim of sexual assault, Grimaldo contends that the trial court abused its discretion in denying Grimaldo's motion to strike Juror 14 for cause. We agree.

When the prosecution initially asked all the jurors if they could follow the law and the jury instructions in this case, Juror 14 did not object. Soon thereafter, when asked if an experience with sexual assault would "influence [her] decision-making" in this case, Juror 14 nodded her head up and down affirmatively. When Grimaldo's attorney followed up to clarify her answer, Juror 14 responded, "I mean, I would hope not, *but*, *I don't know*. It's hard. I would rather go in the back." (Emphasis added).

No one attempted to rehabilitate Juror 14. Nor was she taken to "the back," as she requested. There was no further inquiry about her ability to sit impartially after her equivocal responses. *See DeLeon*, 38 Va. App. at 411-13 (holding that the trial court abused its discretion in denying a motion to strike a juror for cause when the juror responded equivocally to questions about her impartiality and "[n]o further inquiries were made" about the juror's ability to sit

impartially after the juror's equivocal responses). Indeed, as counsel argued their respective motions to strike Juror 14 for cause, Grimaldo's counsel brought to the court's attention that Juror 14 was crying; the trial court acknowledged that Juror 14 was "upset."

A comparison between the voir dire of Juror 14 and that of Juror 17 further highlights the distinction between confirmation of impartiality and the lack thereof. Both Juror 14 and Juror 17 indicated that they had been victims of sexual assault. When asked if she could make an impartial decision, Juror 17 initially stated, "I would want to believe that I could." When asked in follow up: "I mean, do you—you're saying you want to believe. Do you think you can?", Juror 17 responded, "Yes, I would try," and reiterated that it was her "goal" to be impartial. Notably, the record does not reflect that Juror 17 cried or showed any signs that she was upset or otherwise acted in a way to call her unequivocal answer into question. Conversely, Juror 14 responded to the same question with "I don't know" and that she would rather "go in the back." Then she was noted to be crying and "upset" and was never rehabilitated so as to respond unequivocally that she could—or could try to—evaluate the case impartially. *See, e.g.*, *Slade*, 155 Va. at 1106 ("It is the duty of the trial court through the legal machinery provided for that purpose to procure an impartial jury to try every case."); *Goodwin*, 71 Va. App. at 135 ("It is a trial court's responsibility to ensure that jurors are free from bias.").

Viewed "as a whole," these responses created an equivocal effect, sufficient to raise a reasonable doubt as to Juror 14's impartiality. Certainly, in determining juror impartiality, the order of a juror's equivocal and unequivocal responses is not dispositive of a juror's impartiality. Yet, a juror's ultimate equivocal responses, notwithstanding earlier indication of impartiality, may call into question the juror's "whole" or "entire" voir dire. Juror 14's last response that she did not know whether she could be impartial called into question the *entire* voir dire, and— evaluated as a whole—there was reasonable doubt that Juror 14 could be impartial. Previously,

Juror 14 had assented to generalized questions asking if she could follow the law and jury instructions. Once asked about her specific experience, however, Juror 14 provided only *equivocal* responses about her ability to be an impartial and fair juror.

Because such a doubt must be resolved in favor of the accused, we hold that the trial court's refusal to grant Grimaldo's motion to strike Juror 14 for cause was manifest error. Because this error is not harmless error, we must reverse the conviction and remand for a new trial. *DeLeon*, 38 Va. App. at 413 (citing *Justus*, 220 Va. at 975).[4]

## II. Sufficiency of the Evidence

Notwithstanding the fact that we reverse for the trial court's failure to grant Grimaldo's motion to strike Juror 14, this Court must now determine whether the evidence is sufficient to support Grimaldo's conviction; if not, the Commonwealth "would be barred on double jeopardy grounds from retrying [Grimaldo]." *Timbers v. Commonwealth*, 28 Va. App. 187, 202 (1998); *see also Burks v. United States*, 437 U.S. 1, 18 (1978) (holding that the "Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient"). Grimaldo challenges the sufficiency of the Commonwealth's evidence to sustain his rape conviction, contending that M.Q.'s testimony was "inherently incredible and beyond normal experience of human behavior." We disagree.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself

---

[4] Because we reverse on these grounds, we do not reach Grimaldo's additional challenge to Juror 36's impartiality. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alterations in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Caldwell v. Commonwealth*, 298 Va. 517, 526 (2020) (emphasis added) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)).

As to the matter of witness credibility specifically, the scope of our review is even narrower. "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Juniper*, 271 Va. at 415). Moreover, we cannot say that a witness's testimony is "*inherently* incredible [unless it is] *so* contrary to the human experience as to render it unworthy of belief." *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (emphases added) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). In the absence of such extraordinary contradiction, we defer to the factfinder's conclusions on issues of witness credibility. *Id.* "These same principles apply in cases involving rape . . . which may be sustained solely upon the testimony of the victim, even in the absence of corroborating evidence." *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548-49 (2000)).

Grimaldo advances several arguments in support of his contention that M.Q.'s testimony was inherently incredible as a matter of law. These arguments generally fall into three categories:

(1) M.Q.'s interactions with Grimaldo before and after the rape; (2) M.Q.'s motive for accusing Grimaldo of rape; and (3) the photographs of injuries to M.Q. For the following reasons, we find Grimaldo's arguments unavailing, as no evidence renders M.Q.'s testimony inherently incredible as a matter of law.

A. *M.Q.'s Interactions with Grimaldo*

Grimaldo argues that M.Q.'s behavior both on the day in question and in the time immediately after establishes the inherent incredibility of her testimony. He contends that despite her testimony that she was "getting scared" of Grimaldo during her first encounter at his home, "rather than leav[e], [M.Q.] broke a window and threw a bottle of perfume at" him. She also recorded a video of Grimaldo "sitting on a bed while [M.Q.] is yelling at him." Grimaldo further contends that M.Q.'s conduct in meeting him at a food truck, ordering food from the food truck, and "voluntarily" driving her vehicle to his residence after provides "[e]ven more astonishing" facts that M.Q.'s testimony is unworthy of belief. He also emphasizes that, according to M.Q., after Grimaldo raped her, she went out to her vehicle, retrieved their food, and went back into the residence to Grimaldo. Even after leaving the residence later that evening, M.Q. called Grimaldo several times and sent him a text message inquiring why he was not returning her calls; the next day, M.Q. provided information to Grimaldo regarding a pending job.

Grimaldo seems to argue that M.Q.'s conduct that day and the following day is inconsistent with or contradicts her testimony that Grimaldo raped her and thus, is inherently incredible as a matter of law. Grimaldo cites no authority for the proposition that a complaining witness's interactions and conduct with a romantic partner immediately prior to or after a sexual assault by the partner invalidate the credibility of the complaining witness regarding the assault itself, and we

- 13 -

decline to adopt such a per se rule here.[5]  It is hardly contrary to the human experience for two romantically involved adults to vacillate between break-up and reconciliation.  *See, e.g.*, *Richardson v. State*, 581 S.E.2d 528, 529 (Ga. 2003) (considering a victim's "relationship with an ex-boyfriend and whether the desire to reestablish that relationship was a motive to make a false claim of rape" against the defendant).  That such conduct could precede or follow a rape—an act perpetrated by intentionally subduing or overcoming the will of another—is similarly not beyond the human experience.  *See, e.g.*, *State v. Coker*, 230 N.E.3d 556, 564 (Ohio Ct. App. 2023) ("We acknowledge that allegations of rape in a marital relationship often involves course-of-conduct rather than isolated incident testimony."); *Scott v. State*, 635 S.E.2d 582, 589 (Ga. Ct. App. 2006) ("The fact that a relationship between two people was consensual at one time does not preclude a rape conviction when the relationship was no longer consensual.").

Further, Grimaldo's argument insinuates an inconsistent nature or contradiction between M.Q.'s testimony and her conduct.  As this Court has previously recognized, "[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness'[s] testimony or statements."  *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019).  "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law."  *Id.*  Such inconsistencies or contradictions are factors considered in the overall assessment of witness credibility, which, here, was within the purview of the jury as factfinder.  *See id.*; *see also Towler v.*

---

[5] Grimaldo relies on two decisions of the Supreme Court of Virginia: *Barker v. Commonwealth*, 198 Va. 500 (1956), and *Willis v. Commonwealth*, 218 Va. 560 (1977).  These cases, however, involve accusations of rape made by an alleged victim against relative strangers, as opposed to against a long-time romantic partner, and thus are readily distinguishable.  Further, in both cases, the Supreme Court looked to the entirety of the evidence and testimony to determine that no reasonable factfinder would find the respective victim's testimony credible.

*Commonwealth*, 59 Va. App. 284, 292 (2011) ("Potential inconsistencies in testimony are resolved by the factfinder.").

Grimaldo also argues that "rather than going to the police, [M.Q.] went to the bank to withdraw cash and [meet] with her accountant." Here, Grimaldo's contention seems to amount to a delayed reporting argument. Virginia courts have consistently found that delayed reporting does not render a sexual assault victim per se unworthy of belief. *See Juniper*, 271 Va. at 415-16 (holding testimony as credible and rejecting the defendant's contention that the testimony was inherently incredible because there was a "substantial gap" of time between the criminal act and law enforcement involvement); *Wilson v. Commonwealth*, 46 Va. App. 73, 88-89 (2005) (holding a daughter's testimony as credible and rejecting the defendant's argument that his daughter's delayed report of the rape rendered her testimony "inherently incredible"); *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991) (holding a victim's testimony as credible and rejecting the argument that the victim's failure to immediately report an incident rendered his testimony incredible as a matter of law). Indeed, there is no "delayed reporting" exception to the general, well-established principle that a rape conviction "may be sustained solely upon the testimony of the victim." *Ragsdale*, 38 Va. App. at 429. As such, Grimaldo's argument in this regard is meritless.

B. *M.Q.'s Motive*

Grimaldo also argues that M.Q.'s alleged "motivation to fabricate a rape allegation and [signaling of] her intention of revenge" renders her testimony inherently incredible as a matter of law. In support of his argument, Grimaldo points to M.Q.'s admitted threat to "put him in jail for embezzlement," and her several text messages to Claudia identifying herself as Grimaldo's wife, and telling Claudia to "[l]ook for [Grimaldo's] name among the people in the jail of Chesterfield." After Grimaldo's arrest, M.Q. texted Claudia, among other things, that "[w]e

- 15 -

were together for eleven years. I love him despite everything," and that M.Q. and Grimaldo had reconciled. Claudia claims that M.Q. even offered to give Claudia a car if she would terminate her pregnancy.

Once again, Grimaldo provides no legal support for this position. Like inconsistent or contradictory statements, a witness's ulterior motive and bias are factors to be weighed by the factfinder. *See Kelley*, 69 Va. App. at 627; *Johnson*, 58 Va. App. at 315 (holding that as "[t]he possibility of [appellant's] bias was raised during both direct and cross-examination at trial," the appellant's credibility was solely a matter for the factfinder). To adopt Grimaldo's position would require that this Court contravene the relevant standard of review by reweighing the evidence and resolving the conflicts in the testimony de novo. But that is not the role of an appellate court.

C. *The Photographs*

Grimaldo notes that, most importantly, M.Q.'s testimony is belied by "the photographs purporting to show [her] injuries" from the rape. Indeed, Grimaldo contends that this evidence "weighs heavily against her believability." Yet a change in term usage does not change the position of the Court on this issue: the terms "believable" and "credible" are synonymous. *Believability*, *Webster's Third New International Dictionary* (2002) (defining "believability" as "the quality or state of being believed"); *Credible*, *id.* (defining "credible" as "capable of being credited or believed"). And the weight given to the credibility of a witness, including their testimony regarding what may be depicted in a photograph, remains the province of the factfinder. *See Kelley*, 69 Va. App. at 626 ("[T]he finder of fact, 'who determines the credibility of the witnesses and the weight accorded their testimony, may accept or reject the testimony in whole or in part.'" (quoting *Perkins v. Commonwealth*, 31 Va. App. 326, 331 (2000))).

As the trial court observed, M.Q.'s continued contact with Grimaldo, her delayed reporting, and her alleged motivation provide genuine questions as to the credibility of M.Q.'s testimony. But credibility is an issue for the factfinder. *Welch v. Commonwealth*, 79 Va. App. 760, 767 (2024) ("Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." (alterations in original)). Here, the trial court properly submitted M.Q.'s testimony to the jury to resolve its credibility. The jury, having been informed of her post-rape interactions with Grimaldo, her possible motivation to fabricate her rape allegation, her alleged delayed reporting, and the photographs submitted, accepted M.Q.'s testimony. And although the verdict could have stood on the credibility of M.Q.'s testimony alone, *see Fisher v. Commonwealth*, 228 Va. 296, 299 (1984), M.Q.'s testimony was corroborated in part by Grimaldo's admission that they had intercourse, photographic evidence of M.Q.'s torn clothing, and the forensic evidence of M.Q.'s injuries and the marks on Grimaldo's finger and face.

The jury permissibly rejected Grimaldo's versions of the events and convicted him of rape. *See Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018) ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."). Although the trial court recognized the "issues" in the case, it accepted the jury's credibility determination, as there was nothing inherently incredible about M.Q.'s testimony. Accordingly, a reasonable factfinder could conclude beyond a reasonable doubt that Grimaldo was guilty of rape. Thus, we find that the evidence was sufficient to sustain Grimaldo's rape conviction, and therefore the Commonwealth would not be barred from retrying this matter on double jeopardy grounds.

CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court in denying the motion

to strike Juror 14 for cause, and remand for a new trial if the Commonwealth is so inclined.

*Reversed and remanded.*