COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Callins and White
Argued at Salem, Virginia

UNPUBLISHED

MARKESE ANTONIO GRAHAM

v.        Record No. 0969-22-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE DOMINIQUE A. CALLINS
MAY 23, 2023

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Timothy W. Allen, Judge

(William C. Meyer, II, on brief) for appellant.  Appellant submitting
on brief.

Susan Hallie Hovey-Murray, Assistant Attorney General (Jason S.
Miyares, Attorney General; John Beamer, Assistant Attorney
General, on brief), for appellee.


Markese Antonio Graham challenges his convictions for strangulation, abduction, and

three counts of domestic battery.  On appeal, Graham argues that the trial court erred by

(1) admitting the victim's son's hearsay statement that Graham was going to kill the victim,

(2) admitting audio of a 911 call introduced by the Commonwealth on redirect examination to

rehabilitate the victim's credibility, and (3) finding that the evidence was sufficient to convict,

where the victim's testimony was inherently incredible.  Finding no error, we affirm the

judgment of the trial court.

## BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v.*

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413.

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "Therefore, we will 'discard the evidence of the [defendant] in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)).

In December 2021, Markese Graham was in a romantic relationship with M.E.,[1] and they had been living together in M.E.'s home for about one month. On the morning of December 9, 2021, as M.E. woke up to take her twin sons to school, Graham told her, "You're not going nowhere, kids ain't going to the bus stop, kids ain't going to school, ain't nobody going nowhere." Graham then hit M.E.'s face with his open hand, kicked her multiple times in her stomach and back, and strangled her to the point where she couldn't breathe and felt severe pressure in her eyes. These attacks continued intermittently for around eight hours, from 6:30 a.m. to 3:00 p.m. that day. M.E. tried to leave through the front door of her home and screamed in hopes that a neighbor would hear her, but Graham pushed her back and shut the door. M.E. felt as though she was not free to leave. M.E. eventually snuck away from Graham and called 911. During the call, M.E. whispered to the 911 operator that she needed help at her address. By the time the police arrived, Graham had escaped the home through the back door. M.E. spoke to Corporal A.L. Taylor, who observed that M.E. appeared upset and had a red mark on her nose. The police advised M.E. to contact them again if Graham returned.

Twenty minutes later, after the police left, Graham returned to M.E.'s home. M.E. called 911 a second time and told the operator, "He came back" and "I have to hang up cause if he sees me he's going to beat me." Graham kicked M.E.'s front door in and then pushed her through her

---

[1] We use initials, instead of the domestic assault victim's name, to protect her privacy. *See Poole v. Commonwealth*, 73 Va. App. 357, 360 n.1 (2021).

bathroom door, causing the whole door frame to come out. Graham then kicked M.E. multiple times in her back and vagina, causing M.E. to eventually lose consciousness on the kitchen floor. At trial, M.E. testified that she awoke to Graham pouring liquid from a tea pitcher on her and heard her seven-year-old son say, "You're going to kill my mama." Graham objected to the son's statement as hearsay, but the trial court overruled the objection and permitted M.E. to testify to her son's statement under the excited-utterance exception to the hearsay rule.

The police eventually returned to M.E.'s home a second time. The police entered the home to look for Graham, but M.E.'s sons told the police that Graham had fled out the back door into the woods. While speaking with M.E., Corporal Taylor observed red marks from the bottom of her neck to her chest that he did not observe during the first visit to the home. Corporal Taylor also observed that a TV had been thrown down on the floor of the home. A neighbor eventually took M.E. and her sons to M.E.'s father's home, where M.E. made a third 911 call. During this call, M.E. said that Graham "choked me" and had been "strangling me." M.E. then returned to her home to meet with the police again. M.E. told Deputy L.S. Crews that "she had been punched and kicked multiple times, choked, and threw through a bathroom door." Deputy Crews saw signs that "something had taken place," including marks on M.E.'s face and neck, an overturned TV, a busted door, and other items thrown throughout the home. Deputy Crews took photographs of M.E.'s injuries.

Later that day, the police received a report that a person matching Graham's description was walking on Franklin Turnpike. Deputy Crews and Deputy M.K. Gibson encountered Graham on Franklin Turnpike and asked him if he was Markese Graham, but Graham stated that he was not and denied being on M.E.'s street earlier that day. The deputies attempted to apprehend Graham based on information that Graham had an outstanding warrant. Graham then fled, jumped over a guardrail, and fell down an embankment. During the exchange, Deputy

Gibson's finger got caught on Graham's jacket and was broken as Graham ran away. Later that night, Corporal Taylor located Graham and arrested him.

On March 31, 2022, Graham appeared before the Circuit Court of Pittsylvania County for a bench trial, where he pled guilty to fleeing from law enforcement and pled not guilty to charges of strangulation, abduction, three counts of domestic battery, and battery on a law-enforcement officer. During trial, the Commonwealth's case consisted primarily of testimony from M.E. and the sheriff's deputies, as well as evidence of M.E.'s medical records and the photographs of her injuries sustained from the attacks.

During direct examination, M.E. testified in detail about the attacks, including how Graham had strangled her. On cross-examination, Graham attempted to impeach M.E.'s credibility by calling into question her memory of the attacks. M.E. admitted that she had gaps in her memory but explained that memory gaps are a common symptom of trauma and that she was remembering a little bit more every day. Graham then accused M.E. of making things up to fill the gaps in her memory and confronted M.E. about her statement at the preliminary hearing that she could "not remember whether [Graham] had ever even touched [her] neck." M.E. acknowledged that she had made the statement. On redirect examination, the Commonwealth played portions of the 911 calls that M.E. made on the day of the incident. Graham objected to the admission of the third 911 call where M.E. told the operator that Graham "choked me" and had been "strangling me." The trial court overruled the objection on the grounds that the 911 call was admissible as a prior consistent statement for the purpose of rehabilitating M.E.'s credibility, which had been impeached by Graham during cross-examination.

After the Commonwealth rested, Graham made a motion to strike, which the trial court denied. Graham then took the stand in his defense. Graham testified that he and M.E. had stayed up the night before using drugs and alcohol and that M.E. became hysterical when the

- 4 -

drugs ran out. Graham claimed that M.E. had grabbed a knife and pushed him and that they were both fighting on the day of the incident. Graham admitted to throwing M.E. on the ground, hitting her in her face, and kicking her while she was on the ground, but claimed that these attacks were done in self-defense. Graham also testified that their "tussling all around" is what caused M.E.'s TV to fall to the floor. Graham denied touching M.E.'s neck.

At the close of all the evidence, the trial court found Graham guilty of strangulation, abduction, and three counts of domestic battery.[2] In reaching its verdict, the trial court found M.E. to be a credible witness and found that her testimony was corroborated by the 911 calls, the photographs of her injuries, and the sheriff's deputies' observations of her injuries and the damage to her home. The trial court imposed a sentence of 9 years and 48 months, with an active sentence of 2 years and 24 months. This appeal followed.

## ANALYSIS

### I. Excited-Utterance Exception

Graham first argues that the trial court erred in admitting M.E.'s son's hearsay statement, "You're going to kill my mama." Graham asserts that the son's statement does not fall under the excited-utterance exception to the hearsay rule because no evidence showed that the son had firsthand knowledge of Graham's attacks on M.E. Graham contends that the "[t]he child may not have been present, could have been outside, in another room otherwise occupied, or even asleep during the alleged violence."

"As a general rule, hearsay evidence is incompetent and inadmissible, and '[t]he party seeking to rely upon an exception to the hearsay rule has the burden of establishing admissibility.'" *Esser v. Commonwealth*, 38 Va. App. 520, 525 (2002) (quoting *Neal v.*

---

[2] The trial court also found Graham guilty of fleeing from a law-enforcement officer, pursuant to Graham's guilty plea on that charge. The trial court acquitted Graham of the charge of battery on a law-enforcement officer.

*Commonwealth*, 15 Va. App. 416, 420-21 (1992)). "A statement comes within the excited utterance exception to the hearsay rule and is admissible to prove the truth of the matter stated, when the statement is spontaneous and impulsive, thus guaranteeing its reliability." *Id.* (quoting *Braxton v. Commonwealth*, 26 Va. App. 176, 184 (1997)). "The statement must be prompted by a startling event and be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation." *Id.* (quoting *Braxton*, 26 Va. App. at 184). "In addition, the declarant must have firsthand knowledge of the startling event." *Id.* (quoting *Braxton*, 26 Va. App. at 184). "There is no fixed rule by which the question whether the statement is admissible as an excited utterance can be decided. Resolution of the issue depends on the circumstances of each case." *Id.* (quoting *Braxton*, 26 Va. App. at 184). "The decision whether the statement qualifies as an excited utterance lies within the discretion of the trial court." *Id.* (quoting *Braxton*, 26 Va. App. at 184).

Here, the evidence shows that M.E.'s son did not attend school on the date of the incident and was present at M.E.'s home throughout the time that Graham attacked M.E. Considering the extremely violent nature of these attacks—which not only harmed M.E., but also caused significant damage to M.E.'s home—it is reasonable to infer that M.E.'s son had firsthand knowledge of these attacks as they were occurring in M.E.'s home. Additionally, M.E.'s son's statement that "You're going to kill my mama" was made as he directly observed Graham pouring liquid from a tea pitcher onto M.E. as she was lying on the kitchen floor regaining consciousness. This further shows the son's firsthand knowledge of the incident, and also shows that his statement was made as a spontaneous reaction to a startling event, rather than as the result of deliberation. Finally, M.E.'s son was a seven-year-old child at the time of the incident, which suggests that he would have lacked the capacity to fabricate a story that Graham was putting M.E.'s life in danger. *See Braxton*, 26 Va. App. at 184 ("[I]n the case of statements

- 6 -

made by young children, the element of trustworthiness underscoring the spontaneous and excited utterance exception finds its source primarily in the child's lack of capacity to fabricate such a story." (alteration in original) (quoting *Walker v. Commonwealth*, 19 Va. App. 768, 773 (1995))). Therefore, we hold that the trial court did not abuse its discretion in admitting M.E.'s son's statement under the excited-utterance exception to the hearsay rule.

## II. Prior Inconsistent Statement

Graham secondly argues that the trial court erred in admitting M.E.'s third 911 call during the Commonwealth's redirect examination of M.E. Graham asserts that the Commonwealth should not have been permitted to play the third 911 call to rehabilitate M.E.'s credibility because M.E. did not give testimony at the preliminary hearing that was directly inconsistent with her trial testimony that Graham had strangled her. Rather, M.E. only testified during the preliminary hearing that she could not remember whether Graham had touched her neck.

"[T]here is a general rule excluding the prior consistent statements of a witness that are offered for the purpose of buttressing his testimony at trial." *Anderson v. Commonwealth*, 282 Va. 457, 463-64 (2011). But as an exception to this rule, "[w]here the opposing party has attempted to impeach the witness by offering a prior inconsistent statement made by the witness, prior consistent statements made by the witness are admissible to support the witness." *Id.* at 464; *accord* Va. R. Evid. 2:801(d)(2) ("A prior statement that is consistent with the hearing testimony of the witness is admissible for purposes of rehabilitating the witness's credibility . . . if (A) the witness has been impeached using a prior inconsistent statement."). "Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).

"An abuse of discretion occurs 'only when reasonable jurists could not differ' as to the proper decision." *Stark v. Dinarany*, 73 Va. App. 733, 755 (2021) (quoting *Allen v. Allen*, 66 Va. App. 586, 601 (2016)).

Here, during Graham's cross-examination of M.E., Graham impeached M.E.'s credibility by offering M.E.'s prior statement at the preliminary hearing that she could not remember whether Graham had ever touched her neck. Although M.E.'s prior statement that she could not remember was not directly contradictory to her trial testimony that Graham had strangled her, the discrepancy nevertheless called the credibility of M.E.'s trial testimony into question by suggesting that M.E. had manufactured her testimony that Graham had strangled her. Indeed, Graham's question about M.E.'s prior statement at the preliminary hearing was preceded by the question, "You're strong because you've made up things to fill in those gaps [in your memory]. Haven't you?" Under these circumstances, a reasonable jurist could conclude that M.E.'s testimony at the preliminary hearing that she could not remember was inconsistent with her trial testimony, thus triggering the exception permitting the Commonwealth to introduce a prior consistent statement to rehabilitate M.E.'s credibility. Therefore, we hold that the trial court did not abuse its discretion in permitting the introduction of the third 911 call.

## III. Sufficiency of the Evidence

Graham finally argues that the evidence was insufficient to support his convictions because M.E.'s testimony was inherently incredible. Graham contends that M.E.'s testimony was incredible because M.E. testified at trial that she had memory problems in recalling the incident; M.E.'s credibility was impeached by Graham with M.E.'s prior statement at the preliminary hearing, where she testified that she could not remember whether Graham had touched her neck; and Graham testified that M.E. had been using drugs and alcohol with Graham

the night before the incident, which could have affected her memory and perception of the incident.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). "[T]his Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Id.* (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "[T]his Court cannot say a witness'[s] testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Id.* (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

Here, M.E. testified in detail as to the attacks that Graham inflicted upon her throughout the day of the incident, which included hitting her in her face, kicking her while she was on the ground, and strangling her to the point where she couldn't breathe. M.E. also testified as to how Graham prevented her from escaping her home, causing her to feel that she was not free to leave. The trial court, as the factfinder, had the sole responsibility to evaluate M.E.'s credibility and ultimately found her testimony to be credible. Although M.E. admitted to having memory problems and gave prior testimony that was inconsistent with her trial testimony, "[t]estimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). Moreover, the inconsistency in M.E.'s testimony regarding the strangulation was successfully

rehabilitated by the Commonwealth through the introduction of M.E.'s third 911 call, where M.E. stated to the operator that Graham "choked me" and had been "strangling me."

Although Graham testified that M.E. had used drugs and alcohol the night before the incident, this alone, if true, would not cause M.E.'s testimony to be "so contrary to human experience as to render it unworthy of belief." *Lambert*, 70 Va. App. at 759 (quoting *Johnson*, 58 Va. App. at 315). Further, M.E.'s testimony was corroborated by her 911 calls, the photographs of her injuries, and the sheriff's deputies' testimony on their observations of M.E.'s injuries and the damage to her home. Finally, to the extent that Graham's version of the events conflicted with that of M.E.'s, the trial court was "entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused [was] lying to conceal his guilt." *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998). Therefore, we hold that M.E.'s testimony was not inherently incredible and that the evidence was sufficient to convict Graham of strangulation, abduction, and three counts of domestic battery.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed*.