COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff, O'Brien and AtLee
Argued at Lexington, Virginia


QU'SHAWN TYLEK MANNS

MEMORANDUM OPINION* BY
v.       Record No. 1394-22-3            JUDGE MARY GRACE O'BRIEN
OCTOBER 10, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Timothy W. Allen, Judge

Perry H. Harrold for appellant.

John Beamer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Qu'Shawn Tylek Manns (appellant) was convicted of aggravated

malicious wounding, in violation of Code § 18.2-51.2, conspiracy to commit armed burglary, in

violation of Code §§ 18.2-22, 18.2-90, armed burglary, in violation of Code § 18.2-90, grand

larceny of a firearm, in violation of Code § 18.2-95, two counts of conspiracy to commit robbery,

in violation of Code §§ 18.2-22, 18.2-58, two counts of robbery, in violation of Code § 18.2-58,

and four counts of using a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1. On appeal, appellant challenges the sufficiency of the evidence supporting his

convictions, arguing that the testimony of three of his accomplices was inherently incredible.

We disagree and affirm.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

On July 13, 2020, appellant, Te'Sean Brooks, Treavon Taylor, Austin Lane, Sean Schwallenberg, Leon Mitchell, and others recorded a music video using various firearms as props. After recording the video, appellant, Brooks, Taylor, Lane, Schwallenberg, and Mitchell traveled to various locations in Franklin County, including appellant's house and the Windy Lane apartment complex where they smoked marijuana and some of the men drank alcohol. The five men eventually arrived at Zedric Barnett's house where appellant suggested they rob Justin Prillaman ("Justin").

Appellant had known Justin since childhood. Justin and his younger brother, James Matthew Prillaman ("Matthew"), lived in the basement of their grandmother's house; the basement could be accessed only from an exterior door at the back of the house. Sometime before July 13, 2020, appellant, Justin, and Brooks had filmed a video in the Prillamans' basement posing with various firearms belonging to Justin, including a Glock .40 caliber, a Beretta .22 caliber, and an AR-15. Lane had seen appellant, Brooks, and Taylor watching the video on Brooks's phone while they were at the Windy Lane apartments, and Brooks said they were thinking about going to get the guns.

The plan for the robbery was that Lane would act as "lookout" while appellant lured Justin outside where some of the men would hold him at gunpoint and "rough him up."  The other men would then enter the basement and steal drugs, money, and guns.  The men left their cell phones in Brooks's car so that they would not be tracked and traveled to Justin's residence in two cars rented by Taylor and Lane.[1]  Brooks carried a 7.62 caliber AK-47, appellant had a .40 caliber handgun, Mitchell had a .38 caliber handgun, and Taylor and Lane had 9mm handguns.  Schwallenberg also was armed with a handgun.

The men arrived at the Prillaman residence "about 2 or 3 a.m." on July 14, 2020.  Brooks, Lane, and Taylor gathered along the side of the house while appellant knocked on the basement door.  Shortly after Justin opened the door, Brooks and Lane heard a gunshot.  Appellant then ran out of the house with a pistol in his hand saying he "blew [Justin's] brains out his fucking head, go get the shit."

The gunshot awakened Matthew.  He grabbed his 9mm firearm and moved down a hallway toward the basement door.  He saw Justin lying on the ground in the basement's main room.  Brooks was standing in the open doorway when he heard Matthew approach and cock a gun.  When Matthew stepped into view, Brooks fired at him three times with his AK-47.  Matthew heard a gunshot before he fell to the ground, and he was aware of someone jumping over him before he lost consciousness.

After the shots were fired, Brooks, Taylor, and Lane ran back to Lane's car where Big Dutchie and Little Dutchie had waited.  As Taylor was running away, he saw appellant carrying what Taylor believed was an AR rifle.  All the men returned to Barnett's house.  Brooks observed that Schwallenberg and Mitchell, who had ridden to Barnett's house in the same car

---

[1] Two men, "Big Dutchie" and "Little Dutchie," had come with Lane to film the video and accompanied him to Justin's house, but they were not a part of the planned robbery.

with appellant, had an AR-15 that they had not had before the robbery. Appellant admitted to Lane that he shot Justin. The men decided that, if questioned, they planned to say they had been together at the Windy Lane apartments. Using a shovel that was in the car Schwallenberg had borrowed from his grandmother, Schwallenberg and Mitchell assisted Brooks and appellant in burying their AK-47 and .40 caliber firearms because they had been fired.

Schwallenberg arrived at his grandmother's house about 9:30 a.m. on July 14, 2020, with two muddy firearms, a Glock and an AK-47, which he tried to clean in the bathtub. After asking where he acquired the firearms, his grandmother told him to get them out of her house, but she did not contact the police.

Matthew was shot in both arms and his back, and a bullet grazed his lung. He called 911 after he regained consciousness. When the police arrived in the early morning on July 14, 2020, they found Justin's body just inside the open basement door. Justin had been shot in the back of his skull and the bullet exited his face through his nose. The wound showed no stippling, indicating that the shooter had been more than three feet away. Justin had no other injuries that would have caused his death.

The police located two 7.62 caliber shell casings outside the Prillamans' basement door. They also found a .40 caliber shell casing inside the basement room and a metal projectile wedged in a bookcase at the back of the room. Justin's AR-15 was missing. The weapon was not recovered until June 2021 when police in North Carolina found it while executing a search warrant at a residence in an unrelated matter.

On July 15, 2020, police executed a search warrant at Brooks's grandparents' house. In a closet in Brooks's bedroom, the officers found a rifle box containing a manual for the firearm pictured on the box, but no firearm, and 7.62 caliber ammunition. The police recovered Taylor's 9mm handgun from under a sofa at Barnett's house.

Brooks, Taylor, and Lane testified for the Commonwealth at appellant's trial. Brooks had a plea agreement in which he "agree[d] to provide *full* and *truthful* cooperation with the Commonwealth" and specifically affirmed as true an earlier statement he made to law enforcement identifying appellant as the person who shot Justin. The agreement stated that Brooks would "plead guilty or no contest" to six charges, three charges would be nolle prossed, and the remaining five charges would be nolle prossed if Brooks "completely" complied with the agreement. The agreement made no promises as to Brooks's ultimate sentence.

Both Taylor and Lane had been charged with the same 14 offenses as Brooks and appellant, but neither Taylor nor Lane had plea agreements with the Commonwealth at the time of appellant's trial. Taylor said that he decided to testify to get "justice" for Justin. Lane admitted that he "hope[d] something good will happen" because he had testified.

Appellant presented an alibi defense. His girlfriend, Alyssa Weaver, testified that she went to work at a hospital in Roanoke around 6:30 p.m. on July 13, 2020, and appellant picked her up after her shift ended at 7:00 a.m. on July 14. She stated that appellant was at their shared house all night painting a bedroom, but she admitted that she did not actually see him there because she was at work.

Schwallenberg testified that after filming the video he took appellant to the house he shared with Weaver around midnight. He denied that he or appellant had any involvement in the robbery. He also denied going to his grandmother's house with muddy firearms and claimed his grandmother's memory was faulty. Schwallenberg had pled guilty to eight charges arising from the July 14, 2020 offenses and had been sentenced at the time of appellant's trial.[2] He testified

_____

[2] Schwallenberg pled guilty to armed burglary, larceny of a firearm, accessory after the fact to first-degree murder, two counts of robbery, and three counts of use of a firearm. He received an active sentence of 15 years.

he had accepted a plea agreement even though he was innocent because he had heard two people planned to testify against him and he "was trying to receive the least amount of time possible."

On cross-examination the Commonwealth admitted the stipulation of evidence that Schwallenberg's attorney had signed without objection "as to factual summary." The stipulation implicated appellant and was generally consistent with the testimony of Brooks, Taylor, and Lane.

Appellant testified that the group "hung out" in various locations, smoking marijuana, after filming the music video and that Schwallenberg drove him home around 11:00 p.m. He testified that he spent the rest of the evening painting and was not involved in the robbery. He claimed that Lane told him before trial that Lane was testifying only "because the Commonwealth threatened to up [Lane's] guidelines." Lane denied making that statement when recalled by appellant.

The jury found appellant guilty of all but two of the 14 charges.[3] Appellant moved to set aside the verdicts, arguing that the evidence was insufficient to prove his guilt because the Commonwealth's witnesses were not credible.[4] Appellant focused on Brooks's testimony, asserting that his plea agreement was "vague" because it was unclear what Brooks was receiving in exchange for his testimony. The court denied appellant's motion, stating that it found the Commonwealth's witnesses were "very credible" and the physical evidence had corroborated their testimony. The court then sentenced appellant to 118 years' incarceration with 87 years suspended.

---

[3] The jury did not reach a verdict on the charges of first-degree murder of Justin and use of a firearm in the commission of murder, and the trial court declared a mistrial on those charges.

[4] Appellant also contended the verdicts were inconsistent because the jury had not found him guilty of Justin's murder. The trial court ruled that the verdicts were not inconsistent. Appellant has not raised the issue on appeal. Thus, we do not consider it. *See* Rule 5A:20.

ANALYSIS

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021)). The question on appeal is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rock v. Commonwealth*, 76 Va. App. 419, 434 (2023) (quoting *Nelson v. Commonwealth*, 73 Va. App. 617, 622 (2021)). "If there is evidentiary support for the conviction, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Fary v. Commonwealth*, 77 Va. App. 331, 344 (2023) (en banc) (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 342 (2022)).

A motion to set aside the verdict looks only to whether the verdict is "plainly wrong or without evidence to support it." *Wagoner v. Commonwealth*, 289 Va. 476, 484 (2015) (quoting Code § 8.01-680). Appellant has based his challenge to the sufficiency of the evidence on witness credibility. He did not argue at trial, nor does he contend on appeal, that the Commonwealth's evidence, if believed, failed to establish the specific elements of the offenses of which he was convicted. Thus, the issue before this Court is whether appellant's accomplices—Brooks, Taylor, and Lane—provided inherently incredible testimony, thus failing to prove appellant committed the charged offenses. *See Shahan*, 76 Va. App. at 258 (stating that the Commonwealth must prove "the identity of the accused as the perpetrator beyond a reasonable doubt" (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013))).

"[D]etermining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v.*

*Commonwealth*, 64 Va. App. 527, 536 (2015)).  This Court must accept the fact finder's

conclusions regarding witness credibility unless the testimony is "inherently incredible, or so

contrary to human experience as to render it unworthy of belief." *Lopez v. Commonwealth*, 73

Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)).  "To

be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to

believe it, or it must be shown to be false by objects or things as to the existence and meaning of

which reasonable men should not differ.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759

(2019) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Appellant describes Brooks as the "primary witness" against him.  But the force of the

Commonwealth's case came from the fact that Brooks, Taylor, and Lane each provided

consistent and detailed testimony.  Indeed, appellant has not identified any significant

inconsistencies in the testimony.[5]  In arguing that Brooks's testimony was incredible, appellant

relies entirely on Brooks's plea agreement.[6]  The Commonwealth, however, entered that plea

agreement into evidence, and the jury had the opportunity to consider its impact on Brooks's

credibility.  *See Yates v. Commonwealth*, 4 Va. App. 140, 144 (1987) (holding that an

accomplice's testimony under a plea agreement was not inherently incredible where the trier of

fact had the opportunity to evaluate the agreement's impact on the accomplice's credibility).

---

[5] One factual discrepancy was that Brooks testified that Taylor rode to Justin's house in the same car as appellant, Mitchell, and Schwallenberg, while Taylor and Lane testified that Taylor rode with Brooks and Lane.  Such minor errors in memory do not make the testimony unreliable. *Cf. Yates v. Commonwealth*, 4 Va. App. 140, 144 (1987) (holding that the witness's trial testimony was reliable even though it was inconsistent with the statement he originally gave the police).  Further, Brooks, Taylor, and Lane testified consistently that Taylor was in the same car with Brooks and Lane when they left Justin's house after the shootings.

[6] To the extent appellant argues that the Commonwealth was not forthcoming about Brooks's "vague" plea agreement, he did not make the same argument at trial and did not assign error to the failure to disclose any specific consideration that may have been given to Brooks for his testimony.  Thus, any argument on this issue is procedurally barred. *See* Rule 5A:18 and Rule 5A:20.

Indeed, we will not overturn appellant's convictions merely because one of the witnesses against him had a plea agreement, particularly where that testimony was corroborated by other witnesses without plea agreements. The jury also knew that Taylor and Lane had pending charges for their roles in the crimes. Lane acknowledged that he hoped he would receive some future benefit in exchange for his testimony. The possibility of the witnesses' bias was raised during both direct- and cross-examination at trial and was "appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine." *Juniper*, 271 Va. at 415. *See Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (finding no error where the trial court relied on the testimony of a witness who had pending charges based on his participation in the same incident for which the defendant was on trial, but had not been offered anything in exchange for his testimony, and "faced criminal penalties and damage to his prospective college football career if convicted").

Further, although a defendant may be convicted on the uncorroborated testimony of an accomplice, *see Yates*, 4 Va. App. at 143, other evidence in this case supported the accomplices' testimony. Brooks testified that he shot Matthew with a 7.62 caliber AK-47, and the police recovered 7.62 caliber shell casings outside the basement door. Brooks, Taylor, and Lane testified that appellant had a .40 caliber firearm and admitted shooting Justin; the police recovered one .40 caliber shell casing inside the basement and a metal projectile in the bookcase. Brooks testified that he and appellant buried their weapons with help from Mitchell and Schwallenberg. Police found 7.62 caliber ammunition and a AK-47 box at Brooks's grandparents' home, but no firearm. Schwallenberg's grandmother testified that Schwallenberg returned to her house about 9:30 a.m. on July 14, 2020, with two muddy firearms, a Glock and an AK-47. She also said that her car, which Schwallenberg had borrowed on July 13, 2020, was muddy, as was her new shovel that had been in the car. Justin also owned an AR-15, which was

missing when police arrived at the Prillamans' residence. Taylor testified that appellant carried an AR out of the basement after the shootings, and Brooks saw Mitchell and Schwallenberg with an AR after the men returned to Barnett's house. The stolen weapon was recovered in June 2021 in North Carolina. The totality of the other evidence strengthened the testimony of Brooks, Taylor, and Lane.

Finally, a reasonable jury could reject appellant's alibi evidence. *See Rogers v. Commonwealth*, 183 Va. 190, 201 (1944) ("The question of whether an alibi was proven was a question for the jury."). Although Weaver testified that appellant was at their home when the crime occurred, she was at work then and had no independent knowledge of appellant's whereabouts. The jury could reject Schwallenberg's testimony, which was undermined by his own plea agreement and stipulation of facts, as well as by the testimony of the other witnesses. "[T]he trier of fact is free to believe or disbelieve, in whole or in part, the testimony of any witness." *Rams v. Commonwealth*, 70 Va. App. 12, 38 (2019). And the jury was entitled to discredit appellant's self-serving testimony and conclude he was lying to conceal his guilt. *See, e.g.*, *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (en banc); *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018).

The jury, as the fact finder at trial, determined that the Commonwealth's witnesses were credible, and the trial court upheld that finding when it denied the motion to set aside the verdict. Nothing in the record shows that the testimony of Brooks, Taylor, and Lane was "so manifestly false" that it could not be believed or that it was proven false by other evidence presented at trial. *Juniper*, 271 Va. at 415 (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). Because the jury's guilty verdict, which resolved the "credibility issues" in the Commonwealth's favor, was not plainly wrong or lacking in supporting evidence, we will not disturb it on appeal.

*Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

CONCLUSION

For these reasons, we affirm the judgment of the trial court.

*Affirmed.*