UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Ortiz, Friedman and White


ROBERT ALLEN BROTHERTON

                                                      MEMORANDUM OPINION* BY
v.        Record No. 0768-23-3                      JUDGE DANIEL E. ORTIZ
                                                           JUNE 11, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SCOTT COUNTY
John C. Kilgore, Judge

(Melanie B. Salyer; The Salyer Law Firm, PLLC, on briefs), for
appellant.

(Jason S. Miyares, Attorney General; Justin B. Hill, Assistant
Attorney General, on brief), for appellee.


The Circuit Court of Scott County convicted Robert Allen Brotherton of aggravated

malicious wounding, in violation of Code § 18.2-51.2(a); assault and battery against a person

protected by a protective order resulting in injury, in violation of Code § 16.1-253.2(C);

strangulation, in violation of Code § 18.2-51.6; and abduction, in violation of Code § 18.2-47.

Brotherton contends that the trial court erred by (1) repeatedly continuing his trial over his

objections and demand for a speedy trial; (2) admitting certain medical records into evidence; and

(3) finding the evidence sufficient to support his convictions. Because Brotherton failed to move to

dismiss the charges, we find that Brotherton failed to preserve for appeal his first assignment of

error. We also conclude that the trial court did not err in admitting the medical records into

evidence or in finding the evidence sufficient to convict Brotherton of the charges. After examining

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the briefs and record, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a). Thus, we affirm.

BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Brotherton and R.S. met and married in 2017.[1] R.S. testified that on the night of November 17, 2018, she cooked dinner for Brotherton. Afterward, R.S. and Brotherton sat in his truck listening to music while they drank beer. Later, Brotherton decided to drive to the store to purchase more beer. He drove with R.S. "all around the back roads." Brotherton was "already yelling [and] screaming" at R.S. and repeatedly shoved her while he was driving. R.S. begged him to take her home, but the more she begged, the more he screamed. When they finally returned home, Brotherton pushed R.S. out of the truck. Brotherton called R.S. a "cunt, fucking bitch, [and a] slut," before attacking her. As she tried to get away from him, her knee gave out. R.S. ultimately fell to the ground, hitting her shoulder on a cinderblock next to the stairs and breaking her humerus.

R.S. retreated to her apartment. On her hands and knees, she crawled towards the bedroom. Brotherton grabbed her by the back of the head and smashed her face into the floor. R.S. testified that her "blood just squirted." R.S. then exited the apartment and locked herself in

---

[1] We refer to the complainant by her initials to protect her privacy.

her car downstairs, but Brotherton followed and tried to smash the driver's side window with his fist. Unsuccessful, he ran to the passenger side and smashed the window, shattering the glass. R.S. exited the vehicle to flee, trying to crawl up the stairs to the apartment, when Daniel Barnette, Thomas Heath Culbertson, and Trevor Ramsey saw her from their car and offered to help her up the stairs. She did not let "the boys" help her upstairs because she feared for their safety.

After "the boys" left to call the police, Brotherton dragged R.S. up the stairs by her coat, slung her on the bed, turned off all the lights, and straddled her. When he heard cars approaching, Brotherton put one hand over her mouth, one hand around her throat, and, applying pressure to her throat, warned, "make a sound and I will fucking kill you." R.S. heard the police banging on the door, but she remained quiet. She could not breathe or make a sound. After the police officers left, Brotherton sat in the recliner and then went to bed. R.S. stayed in the bed because she was in "excruciating pain." She begged Brotherton to call an ambulance for her, but he refused.

After some time, R.S. awoke Brotherton because she needed to use the bathroom and could not stand up. Cussing, Brotherton "started to pull on [her] left arm," but when she could not raise her body up he returned to the recliner. She heard him open more beer. Brotherton then returned to the bed, took her pants off, got on top of her, and "forced himself inside of [her]." At around 5:00 a.m., Brotherton put his hand over her face, shoved her head down in the bed and said, "bitch, if you have me fucking put in jail again, you better make sure you have police protection 24/7, because I will fucking kill you." Brotherton then left the apartment. It took R.S. about three hours to get out of bed, get her pants back on, get to the door, and "start screaming for help."

- 3 -

R.S. testified that, in August 2018, she obtained a protective order against Brotherton because of domestic abuse. At that time, Brotherton faced criminal charges and jail time based on her reports of his violence against her. Later, when Brotherton threatened to have her charged with perjury, she tried to dissolve the protective order. But the juvenile and domestic relations district court ("JDR court") refused to dissolve the order, which remained in effect on November 17, 2018. She testified that she believed Brotherton wanted to kill her because, when he was drunk, he repeatedly asked her whether she would have him arrested or put in jail again. She also stated that, despite the protective order, she had invited Brotherton to move back in with her a few weeks after he got out of jail, after being contacted by a preacher.

On cross-examination, R.S. admitted that she and Brotherton often argued out of jealousy on both their parts. They went through each other's phones, and she sometimes checked Brotherton's wallet. She admitted to finding several women's names and numbers in his wallet and arguing with him about them. She denied ever striking Brotherton, except in self-defense, but she admitted that, with the possible exception of her son, no one else had ever witnessed Brotherton be violent to her. She also admitted that she had told an officer that she had not had nonconsensual sex with Brotherton "on that Saturday," meaning November 17, but said she had failed to remember due to trauma.

R.S. ultimately remained in the hospital for nine days. She suffered a broken nose, a broken shoulder, and a broken neck. At the time of trial, R.S. still had a scar on her neck from a resulting surgery. She could no longer fully turn or bend her head, and she did not have a full range of motion in her left arm or shoulder. She was in constant pain.

Several other witnesses corroborated R.S.'s description of events. Barnette testified that on the night of November 17, 2018, he and his friends Ramsey and Culbertson were driving home from dinner when they saw Brotherton and R.S. outside R.S.'s apartment. Barnette was a

friend of R.S.'s son and had known R.S. for many years. He knew Brotherton through R.S. Barnette saw Brotherton crouched over R.S., who was "in a vulnerable position" on the ground. Although it was very cold outside, Brotherton was not wearing a shirt. As Barnette and his friends rode by, Barnette thought that R.S. was vomiting, so he and his friends turned back to see if they could help. Barnette testified that when they approached the couple, R.S. was "very upset, crying." Both R.S. and Brotherton appeared drunk. R.S. reported that Brotherton had pushed her down the stairs. She was holding one of her knees and said she could not walk. Brotherton agreed to let Barnette and his friends carry R.S. back up the stairs to the apartment; he explained that R.S. was "just trying to raise hell to get [Barnette] to call the cops." R.S. told Barnette and his friends to "get the fuck out of here," but then said, "call the cops, he's trying to kill me."

Barnette and his friends drove to a nearby pizza parlor and called the police.[2] They then returned to R.S.'s apartment, where they observed that "all the lights were out" and saw broken glass from the shattered window of a car parked at the bottom of the stairs. Barnette stood by as police knocked on R.S.'s apartment door for "five minutes, at least," before kicking hard on her door. No one answered. Ramsey and Culbertson testified to the same series of events.

On the morning of November 18, after learning that R.S. was in the hospital, Barnette went to visit her. Barnette saw that R.S. was bruised, that she wore a neck brace, that she could not sit up in bed, and that she could hardly talk. He did not recall seeing any injuries on Brotherton the previous night.

Jarvis Vicars testified that he lived "right across the creek" from R.S. and had a "pretty clear view" of her apartment, which was situated on the second floor of an old, renovated store building. On the morning of November 18, 2018, Vicars heard a strange noise coming from the

---

[2] There was no cell service at R.S.'s apartment.

direction of R.S.'s apartment. Outside, he could see R.S. standing in her doorway at the top of the steps. When he went outside, she hollered at Vicars to call the rescue squad. Vicars obliged and, with other neighbors, assisted R.S. down the steps from her apartment and into the ambulance. He did not see Brotherton's truck that morning.

Several witnesses also testified about R.S.'s injuries. Scott County Sheriff's Deputy Rachel Townsend was employed as a "domestic violence officer" in November 2018. On November 19, 2018, Townsend learned of the incident that occurred between R.S. and Brotherton and responded to the hospital to investigate. She took photographs of R.S.'s injuries, which included two bruised eyes, marks and bruising around her neck, bruises on her arms, and bruising and scrapes on her knee. Townsend noticed that R.S. was feeling enough pain that she could not write without spasming and almost screaming out. Townsend took additional photographs of R.S.'s injuries on December 3 and 4, 2018, and January 1, 2019. Townsend also remembered seeing R.S. in JDR court in September 2018, seeking to dissolve a protective order she had obtained against Brotherton. During that hearing, Townsend observed R.S. look at Brotherton after each question posed by the court and she saw Brotherton nodding or shaking his head. The JDR court did not dissolve the protective order.

Bonnie Henley worked as a nurse practitioner in neurosurgery at Blue Ridge Neuroscience Center ("Blue Ridge"). She treated R.S. for neurological injuries she sustained in the assault. When the Commonwealth sought to admit R.S.'s medical records from Blue Ridge, Brotherton objected, arguing that Henley was not a custodian of the records, Henley could not verify the records' authenticity, and the records were hearsay. Henley clarified that she was the author of the report and that it was in no way altered other than that the attending doctor added a note to her assessment. On voir dire, Henley admitted that her report included information that she herself did not author, such as R.S.'s vital signs, her smoking status, her sexual history and

- 6 -

other things that the computer would have "pulled to the note." Even still, Henley testified that she wrote much of the report, including the "HPI section," the reason for the consultation, an evaluation of R.S.'s general appearance, the results of R.S.'s physical examination, and her notes on all of the "body systems," including the musculoskeletal system, the neurological system, the cranial nerves, sensation, and the "DTR." Over Brotherton's objection, the trial court admitted the report and stated it would consider only "the parts that [Henley] authored."

Dr. Ken Smith also treated R.S. at Blue Ridge. Smith reviewed Henley's notes and then performed a consultation, adding his own notes, "on the essential portions." When Smith began to testify about his portion of the report, Brotherton objected because Smith's notes started on page 24 and Brotherton asserted that the Commonwealth should be required to admit the "complete record" for consideration. The trial court overruled the objection and allowed the Commonwealth to admit only the portions of the record that it considered relevant. Smith noted in his report that R.S. had a "rotary inflection type injury" and explained that her injury suggested her head was rotating "in a certain direction, and the body [was] not following it for some reason." The movement broke R.S.'s neck. He also noted "some potential deceleration injury from hitting the floor or some object." Dr. Smith recommended surgery. During the surgery, Dr. Smith inserted titanium rods and screws into R.S.'s neck.

Brotherton testified in his own defense, laying out a different picture of his relationship with R.S. and the events of November 17. Brotherton denied ever hitting, punching, kicking, raping, or dragging R.S. during the course of their marriage. He admitted that he and R.S. consumed alcohol "pretty much every day." He testified that R.S. drank much more than she had admitted during her testimony. Brotherton also said that in June or July of 2018, R.S. used a knife to slash the tires on his truck to keep Brotherton from leaving during an argument. Vicars testified that he called the police after that incident. Brotherton did not leave the marriage at that

point, because R.S. apologized after "she sobered up." He also asserted that in August 2018, while driving in Tennessee, he and R.S. were arguing about whether he was cheating when R.S. threw a pizza box at him. He pulled over and went to the passenger side of the truck. She locked the door and was "standing there jerking her head around" when she smacked her head on the glass window, causing her right eye to swell up. R.S. called her sister and asked her to call the police to meet them back at their house. Brotherton was arrested, remained in jail for three and a half days, and was served with a protective order upon his release. He encountered R.S. a few days after his release when his father came to her apartment to drop things off; Brotherton stayed in the car but R.S. yelled at him. A few weeks later, R.S. called Brotherton and asked if they could meet and work things out; he agreed if they could meet outside of Virginia. After staying together for two nights in Tennessee, they returned together to R.S.'s apartment.

Brotherton described November 17 as a "normal" workday. When he returned home, he and R.S. ate dinner and drank beer before listening to music in his truck. He said that R.S. ran out of beer and requested that they go before the store closed at 10:00 p.m. After purchasing more beer, the two argued on the way back to their apartment. At home, when he did not engage in the argument, R.S. suddenly started screaming "help, help, and all this," and then went downstairs to her car, where she sat and honked the horn to get Vicars's attention. He followed her and asked why she was bothering the neighbors. She turned on the car and drove it into Vicars's driveway, but when he did not emerge, she drove back and parked the car. Brotherton tapped on the window to see what was going on. After Brotherton circled to the passenger side and found the door locked, R.S. exited her car and threw a beer bottle at him, shattering the passenger side window. She then tried unsuccessfully to break the window of his truck with a cinderblock from nearby. He took the cinderblock from her and started to walk back up the stairs when she grabbed him; she fell down when he jerked his arm away. He helped her up

from the ground and sat her down on the stairs and that is when "the boys" showed up. He heard R.S. tell them to "get the fuck out of here," and after they left he helped R.S. up the stairs. He said they both laid down in the bed for the rest of the night. When the police arrived, he and R.S. agreed not to answer the door because they knew they were "both going to jail." He stated that he did not hold his hand over her mouth or apply pressure to her throat, and he denied that she asked him for help getting to the bathroom. He left the apartment early the next morning and spent the entire day with friends. He did not call R.S. that day, and when he returned home that evening, R.S. was not there and he did not know where she was.

Brotherton moved to dismiss the charges because "on the testimony that's in front of the court today, I don't believe that a reasonable fact finder could find that it rises to a level beyond a reasonable doubt to convict." In his closing argument, Brotherton asserted that R.S. was not a credible witness, that the evidence failed to prove the requisite criminal intent on his part, and that the trial court should dismiss the charges. The trial court disagreed and convicted Brotherton of aggravated malicious wounding, assault and battery of a person under a protective order, strangulation, and abduction.[3] Brotherton appeals.

ANALYSIS

I. Brotherton's speedy trial argument is not preserved.

Brotherton first argues that the trial court violated his right to a speedy trial "by granting continuances over the appellant's objection and demand for a speedy trial." He maintains that "the charges should have been dismissed." Yet because Brotherton did not move to dismiss the charges based on a violation of his speedy trial rights, he has waived this issue for purposes of appeal and, finding that the ends of justice exception does not apply, we affirm the trial court's judgment.

---

[3] The trial court found Brotherton not guilty of a rape allegedly occurring on November 15, and dismissed or nolle prosequied several related misdemeanor charges following the Commonwealth's case in chief.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641-42 (2009).

By his own admission, Brotherton did not move to dismiss the charges on speedy trial grounds, but he argues that the trial court erred by granting two continuances over his speedy trial objection. Indeed, Brotherton noted his objection to a January 31, 2022 continuance order "on the grounds that [he] has repeatedly requested a trial and been unable to receive one." His objection further stated that he "requests a fast and speedy trial in accordance with the U.S. and Virginia state constitutions." He again objected to a continuance order dated August 3, 2022, "on the grounds that [he] previously requested a speedy trial . . . [and] continues to demand a speedy trial." But Brotherton appeared for trial on November 28, 2022, entered pleas of not guilty, and presented his defense. He did not raise a speedy trial argument, he did not seek a hearing on a speedy trial claim, and he did not obtain a ruling on a speedy trial violation. He has therefore waived this assignment of error, and we will not consider it. *See Howard v. Commonwealth*, 55 Va. App. 417, 425 (2009) ("Settled principles provide that appellant's brief reference to the constitutional issue in his written

motion was insufficient to preserve this aspect of the claim for appeal."), *aff'd*, 281 Va. 455 (2011);

*Commonwealth v. Hilliard*, 270 Va. 42, 53 (2005) (holding party failed to preserve issue of Sixth

Amendment right to counsel where he mentioned it in his written motion to suppress but did not

raise it during argument at the motion to suppress hearing and did not ask the trial court to rule on

the claim).

Acknowledging this, Brotherton asks that we apply the good cause or ends of justice

exception to Rule 5A:18 and reverse the trial court's judgment. We decline that invitation. This

Court "may only invoke the 'good cause' exception where an appellant did not have the opportunity

to object to a ruling in the trial court." *Perry v. Commonwealth*, 58 Va. App. 655, 667 (2011).

"[W]hen an appellant 'had the opportunity to object but elected not to do so,' the exception does not

apply." *Id.* (quoting *Luck v. Commonwealth*, 32 Va. App. 827, 834 (2000)).

Brotherton argues that this Court should apply the good cause exception to his failure to

preserve the issue because he was not afforded the opportunity to object to the April 2022

withdrawal of the formerly appointed special prosecutor. He argues that the trial court's failure to

notify him that the special prosecutor intended to withdraw precluded him from objecting to a

continuance of the trial on that basis. However true that might be, we fail to see how that compels

the application of the exception. Even if Brotherton did not have an opportunity to object to the

special prosecutor's April 2022 motion to withdraw, he still could have filed a motion to dismiss on

speedy trial grounds before the trial commenced and failed to do so. Instead, he and his counsel

appeared for trial and without further delay presented his defense. We therefore find that the good

cause exception does not apply here.

The ends of justice exception also does not apply. "'The ends of justice exception is narrow

and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of

justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting

- 11 -

*Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)).  Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)).  "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Redman*, 25 Va. App. at 221.  "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)).  "In order to show that a miscarriage of justice has occurred, . . . the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Brittle*, 54 Va. App. at 514 (alteration in original) (quoting *Redman*, 25 Va. App. at 221-22).

Brotherton does not suggest that he was convicted of a non-offense or that the record affirmatively proves that any of the elements of the offenses did not occur.  Rather, he argues that the trial court's violation of his speedy trial rights resulted in a lengthy period of incarceration to which he should not have been subjected.  But that fact, even if true, does not support an application of the ends of justice exception to his failure to timely object on speedy trial grounds.

Because the good cause and ends of justice exceptions do not apply to Brotherton's failure to preserve this assignment of error for appeal, we will not consider the merits of his argument.

II.  The trial court did not err in admitting R.S.'s medical records.

Brotherton contends that the trial court erred in admitting portions of R.S.'s medical records "without proper authentication," and when the entire medical record was not provided to him before trial "against the rules of evidence and discovery."  We disagree.

- 12 -

"The determination of the 'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "Only when reasonable jurists could not differ can [an appellate court] say an abuse of discretion has occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

"All writings are subject to the requirement of authentication, which is the providing of an evidentiary basis sufficient for the trier of fact to conclude that the writing came from the source claimed." *Walters v. Littleton*, 223 Va. 446, 451 (1982). "The amount of evidence sufficient to establish authenticity will vary according to the type of writing, and the circumstances attending its admission, but generally proof of any circumstances [that] will support a finding that the writing is genuine will suffice." *Id.* "Authentication is merely the process of showing that a document is genuine and that it is what its proponent claims it to be." *Jackson v. Commonwealth*, 13 Va. App. 599, 602 (1992) (quoting *Owens v. Commonwealth*, 10 Va. App. 309, 311 (1990), *overruled in part by Waller v. Commonwealth*, 278 Va. 731 (2009)). Two non-statutory means of establishing the

authenticity of a writing are "direct evidence and testimony." *Id.* "Direct evidence involves witnesses testifying as to the origin or execution of a document." *Id.*

Brotherton does not argue on appeal that the medical records were inadmissible hearsay; nor does he address the business records exception to the hearsay rule. He merely argues that R.S.'s medical records were not properly authenticated "in violation of Rule 2:902" because "medical records are not self-authenticating." Brotherton argues, without any supporting case law, that the Commonwealth was required by the rules of evidence to authenticate the medical records exclusively through a custodian of records. We disagree because, in this case, a custodian of records would only be necessary in the absence of the testifying witnesses. That is, the Commonwealth sufficiently authenticated relevant portions of R.S.'s medical records through the testimony of the authors of the admitted records—Henley and Smith. Because Henley and Smith authored the relevant medical records, they were each uniquely qualified to authenticate what they wrote, and because Brotherton was allowed to cross-examine each witness on the accuracy of his or her report, we find no abuse of discretion in the trial court's decision to admit the relevant portions of R.S.'s medical records.

Brotherton's contention that the records were inadmissible because he was not provided the entire medical record before trial is also unavailing. Brotherton presents us with no authority supporting his assertion that the Commonwealth was required to turn over R.S.'s entire medical record to him, and we find none. "It is a fundamental principle of jurisprudence that evidence [that] is not relevant is not admissible." *Perry v. Commonwealth*, 61 Va. App. 502, 509 (2013) (quoting *McMillan v. Commonwealth*, 277 Va. 11, 22 (2009)). Moreover, "[w]hile evidence may be relevant in that it tends to establish the proposition for which it was offered, in order to be admissible, it must also be material." *Commonwealth v. Proffitt*, 292 Va. 626, 634-35 (2016) (quoting *Brugh v. Jones*,

- 14 -

265 Va. 136, 139 (2003)). "To be material, 'the evidence [must] tend[] to prove a matter that is properly at issue in the case." *Id.* (alterations in original) (quoting *Brugh*, 265 Va. at 139).

The records the Commonwealth sought to admit were relevant and material to the nature and extent of R.S.'s injuries. They were provided in discovery, and Brotherton consulted them to prepare his defense. Brotherton fails to articulate how or whether the additional portions of the medical record were relevant and material to this case and, instead, merely claims that the record was incomplete. We find no merit in Brotherton's argument and conclude that the trial court did not abuse its discretion in admitting Henley's consultation note and Smith's surgery note, even without the remaining parts of the medical record.

III. The Commonwealth presented sufficient evidence to support Brotherton's convictions.

Lastly, Brotherton challenges the sufficiency of the evidence to prove the charges "because no reasonable trier of fact could find that [the] Commonwealth proved each and every element of the offenses beyond a reasonable doubt." Specifically, Brotherton asserts that R.S. was not a credible witness and concludes that her testimony failed to establish the requisite elements for aggravated malicious wounding. He also argues that the injury to her neck was inconsistent with strangulation.[4] Bound by our standard of review, we affirm Brotherton's convictions.

When an appellant challenges the sufficiency of the evidence supporting his convictions, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such

---

[4] Brotherton does not specifically challenge the sufficiency of the evidence for the crimes of abduction and assault and battery of a person under a protective order. We will therefore limit our discussion to the elements establishing the offenses of aggravated malicious wounding and strangulation. *See* Rule 5A:20; *Stokes v. Commonwealth*, 49 Va. App. 401, 410 (2007) ("Statements unsupported by argument, authority or citations to the record do not merit appellate consideration." (quoting *Epps v. Commonwealth*, 47 Va. App. 687, 718 (2006) (en banc))).

cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). Instead, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Determining the credibility of the witnesses and the weight afforded their testimony "is within the exclusive province of the [trier of fact], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "Where credibility issues are resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010). This Court must accept a trial court's judgment on the credibility of a witness's testimony "unless, 'as a matter of law, the testimony is inherently incredible.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). "In other words, this Court cannot say a witness'[s] testimony is inherently incredible unless it is 'so contrary to human experience as to render it

unworthy of belief.'" *Lambert*, 70 Va. App. at 759 (quoting *Johnson v. Commonwealth*, 58

Va. App. 303, 315 (2011)).

> When the law says that it is for triers of the facts to judge the
> credibility of a witness, the issue is not a matter of degree.  So long
> as a witness deposes as to facts[,] which, if true, are sufficient to
> maintain their verdict, then the fact that the witness'[s] credit is
> impeached by contradictory statements affects only the witness'[s]
> credibility; contradictory statements by a witness go not to
> competency but to the weight and sufficiency of the testimony.  If the
> trier of the facts sees fit to base the verdict upon that testimony there
> can be no relief in the appellate court.

*Smith*, 56 Va. App. at 718-19 (first alteration in original) (quoting *Swanson v. Commonwealth*, 8

Va. App. 376, 379 (1989)).

## A.  Aggravated Malicious Wounding

Any person who "maliciously . . . wounds any other person, or by any means causes bodily

injury, with the intent to maim, disfigure, disable or kill" is guilty of aggravated malicious

wounding "if the victim is thereby severely injured and is caused to suffer permanent and significant

physical impairment."[5]  Code § 18.2-51.2.  "Malice inheres in the doing of a wrongful act

intentionally, or without just cause or excuse, or as a result of ill will.  [Malicious intent to wound]

may be directly evidenced by words, or inferred from acts and conduct [that] necessarily result in

injury."  *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (first alteration in original)

(quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).  Malice inferred from acts and

conduct "encapsulates 'a species of reckless behavior so willful and wanton, so heedless of

foreseeable consequences, and so indifferent to the value of human life that it supplies the element

of malice.'"  *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (quoting *Essex v.*

---

[5] Brotherton does not dispute that R.S. suffered permanent and significant physical impairment.  He merely argues that his aggravated malicious wounding conviction should be reversed because the evidence was insufficient to prove the requisite elements of malice and intent.

*Commonwealth*, 228 Va. 273, 288 (1984) (Poff, J., concurring in part, and dissenting in part). "The presence of malice 'is a question of fact to be determined by [the trier of fact].'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (alteration in original) (quoting *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989)).

Aggravated malicious wounding separately requires the Commonwealth to prove intent. "Intent is the purpose formed in a person's mind which may, *and often must*, be inferred from the facts and circumstances in a particular case." *Perkins*, 295 Va. at 330 (quoting *Burton v. Commonwealth*, 281 Va. 622, 626-27 (2011)). As with malice, "[t]he state of mind of an alleged offender may be shown by his acts and conduct." *Id.* (quoting *Burton*, 281 Va. at 627). Moreover, the factfinder may "infer that every person intends the natural, probable consequences of his or her actions." *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011). Thus, "[i]t is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Burkeen*, 286 Va. at 260-61.

On this record, we cannot conclude that the evidence failed to prove Brotherton acted maliciously and with the intent to maim, disfigure, disable, or kill R.S. The evidence, taken in the light most favorable to the Commonwealth, *Vay*, 67 Va. App. at 242, established that the eve of November 17 started like any other, with dinner and drinks. Brotherton started an argument as he sat with R.S. in his truck, listening to music. He then drove R.S. around the back roads of Scott County, yelling and screaming at her the entire time. When they arrived home, he pushed her out of the truck and then slung her around, all the while cursing at her. R.S. fell to the ground, hitting her shoulder on a cinderblock next to the stairs and breaking her arm. Once upstairs, Brotherton grabbed R.S. by the hair and slammed her face against the floor, breaking her nose. Upon her escape to her car, Brotherton smashed the passenger side window and made R.S. return to the

apartment, where he straddled her and put his hands over her mouth and throat before threatening to kill her if she made a sound. And he refused to help her get out of bed to use the bathroom and ignored her repeated pleas to call an ambulance. She remained in excruciating pain all night and until after he left the apartment. Before he left, Brotherton threatened to kill her if she pressed charges. Brotherton then remained away from home for the rest of the day and did not check on her. The incident resulted in significant and permanent injuries to R.S., requiring a lengthy stay in the hospital and surgery. Brotherton's consistent death threats, violent actions, and unwillingness to intervene despite R.S.'s extreme pain together are sufficient for a fact finder to conclude that he acted with malice. *See Watson-Scott*, 298 Va. at 256.

Despite Brotherton's arguments to the contrary, R.S.'s testimony was not incredible, and we decline to disturb the trial court's decision to credit her testimony. *See Lambert*, 70 Va. App. at 759. Even still, although R.S.'s testimony alone established the elements of aggravated malicious wounding, her testimony was also corroborated by "the boys," who saw her on the ground in a vulnerable position while Brotherton stood over her. Stopping to check on her, they noted that R.S. was hurt and sought to help her up the stairs. They then contacted the police and returned to the apartment to assist, at which time they observed broken glass from the shattered car window. They noticed that the lights were out in the apartment and watched as responding deputies knocked on the door for at least five minutes before kicking it so hard the door frame shook. This testimony coincided nearly exactly with the events described by R.S. and corroborated her testimony.

For similar reasons, the trial court was not "plainly wrong" in finding that the Commonwealth proved that Brotherton had "intent to maim, disfigure, disable or kill." Code § 18.2-51.2. Brotherton's repeated threats to kill R.S., coupled with the demeaning and derogatory names he called her and the violence he unleashed upon her, clearly established the requisite statutory intent. Serious injury was the natural and probable result of repeatedly, forcefully pushing

- 19 -

R.S. around and then depriving her of medical attention despite her pleas for aid. *See Ellis*, 281 Va. at 507. A reasonable trier of fact could conclude that the evidence was sufficient to prove the crime of aggravated malicious wounding.

### B. Strangulation

"Any person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation . . . ." Code § 18.2-51.6. Bodily injury "is any bodily injury whatsoever and includes an act of damage or harm or hurt that relates to the body; is an impairment of a function of a bodily member, organ, or mental faculty; or is an act of impairment of a physical condition." *Wandemberg v. Commonwealth*, 70 Va. App. 124, 133 (2019) (quoting *Ricks v. Commonwealth*, 290 Va. 470, 479 (2015)). "[T]o prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin. Nor must she offer proof of 'broken bones or bruises.'" *Id.* at 134 (quoting *Ricks*, 290 Va. at 479). "[I]nternal injuries [also] . . . fall within the scope of Code § 18.2-51.6." *Id.* (alterations in original) (quoting *English v. Commonwealth*, 58 Va. App. 711, 719 (2011)).

In this case, R.S. testified that when the police arrived, Brotherton straddled her on the bed, put one hand over her mouth and the other around her throat, and threatened to kill her if she made a sound. R.S. could not breathe and had visible bruises on her throat the next day. R.S.'s testimony, accepted as truthful by the trier of fact, sufficiently proved that Brotherton strangled R.S. Any minor inconsistencies in R.S.'s statements do not alter this conclusion. Rather, such inconsistencies are to be weighed and "resolved by the fact finder." *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011). "We do not revisit such conflicts on appeal 'unless "the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion."'" *Id.* (alteration in original) (quoting *Molina v. Commonwealth*, 47

Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006)).  Moreover, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."  *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).  We find no error in the trial court's ruling.

CONCLUSION

Accordingly, the trial court's judgment is affirmed.

*Affirmed.*